739 F.2d 1057
 Fed. Sec. L. Rep. P 91,569, Fed. Sec. L. Rep. P 91,668
Clevester DAVIS; Jimmie Lee King; and Virginia Ann King,
Plaintiffs- Appellees, Cross-Appellants,
v.
AVCO FINANCIAL SERVICES, INC., Defendant-Appellant, Cross-Appellee,
Lee McCormick, Defendant.
 Nos. 82-3553, 82-3572.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 2, 1984.
Decided July 10, 1984.
Opinion on Denial of Rehearing and Rehearing En Banc Sept. 7, 1984.
 
 1
 Theodore M. Rowen, argued, Richard E. Wolff, Andrew E. Anderson, Spengler, Nathanson, Heyman, McCarthy, & Durfee, Toledo, Ohio, for defendant-appellant, cross-appellee.
 
 
 2
 Thomas A. Karol, argued, A.B.L.E., Inc., Dale A. Wilker, Glenn G. Galbreath, Toledo, Ohio, for plaintiffs-appellees, cross-appellants.
 
 
 3
 Before LIVELY, Chief Judge, JONES, Circuit Judge, and BERTELSMAN, District Judge.*
 
 
 4
 BERTELSMAN, District Judge.
 
 
 5
 This securities case presents this court with an issue of first impression in this circuit, namely, who may be considered a "seller" under Sec. 12(2) of the Securities Act of 1933. Other circuits have expressed diverse views regarding this issue, as have the commentators. The Supreme Court of the United States has never passed on it. Various subsidiary issues are also presented, as will be discussed below.
 
 FACTS
 
 6
 This is a securities fraud class action arising out of the activities of defendants/appellants AVCO Financial Services, Inc. and defendant McCormick, the manager of Avco's Toledo, Ohio office. The plaintiffs/appellees all borrowed money from Avco in order to buy shares of a scheme called "Dare to be Great" (DTBG). DTBG was a pyramidal scheme wherein investors could buy "adventures" at Levels I, II, III or IV. Purchases of adventures Levels III (price: $2,000) and IV (price: $5,000) gave the purchasers the right to sell adventures to other purchasers, and collect a commissin thereon.
 
 
 7
 The sales of DTBG were based on hard-sell tactics and promises of quick wealth by salespeople who flaunted money and expensive cars, clothing, jewelry, and the like. Because of its inherent "saturation" character, this scheme was apparently doomed to fail, and did so in 1974, causing members of the plaintiff class to lose nearly all of the money they had invested in it. DTBG marketing techniques are described in detail in S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The evidence in this case is the same as the evidence described in the Ninth Circuit case. The operation of the DTBG enterprise was described therein as follows:
 
 
 8
 "II. The Adventures and the Plan in operation.
 
 
 9
 "It is apparent from the record that what is sold is not of the usual 'business motivation' type of courses. Rather, the purchaser is really buying the possibility of deriving money from the sale of the plans by Dare to individuals whom the purchaser has brought to Dare. The promotional aspects of the plan, such as seminars, films, and records, are aimed at interesting others in the Plans. Their value for any other purpose, is, to put it mildly, minimal.
 
 
 10
 "Once an individual has purchased a Plan, he turns his efforts toward bringing others into the organization, for which he will receive a part of what they pay. His task is to bring prospective purchasers to 'Adventure Meetings.'
 
 
 11
 "A. The meetings.
 
 
 12
 "These meetings are like an old time revival meeting, but directed toward the joys of making easy money rather than salvation. Their purpose is to convince prospective purchasers, or 'prospects', that Dare is a sure route to great riches. At the meetings are employees, officers, and speakers from Dare, as well as purchasers (now 'salesmen') and their prospects. The Dare people, not the purchaser-'salesman', run the meetings and do the selling. They exude great enthusiasm, cheering and chanting; there is exuberant handshaking, standing on chairs, shouting, and 'money-humming'. The Dare people dress in expensive, modern clothes; they display large sums of cash, flaunting it to those present, and even at times throwing it about; they drive new and expensive automobiles, which are conspicuously parked in large numbers outside the meeting place. Dare speakers describe, usually in a frenzied manner, the wealth that awaits the prospects if they will purchase one of the plans. Films are shown, usually involving the 'rags-to-riches' story of Dare founder Glenn W. Turner. The goal of all of this is to persuade the prospect to purchase a plan, especially Adventure IV, so that he may become a 'salesman', and thus grow wealthy as part of the Dare organization. It is intimated that as Glenn W. Turner Enterprises, Inc. expands, high positions in the organization, as well as lucrative opportunities to purchase stock, will be available. After the meeting, pressure is applied to the prospect by Dare people, in an effort to induce him to purchase one of the Adventures of the plan. The sale is sometimes closed by the purchaser who brought the prospect to the meeting, but primarily, by Dare salesmen, specialists in the 'hard sell.'
 
 
 13
 "The format of the meeting is preordained. A script created by Dare is strictly adhered to. The format applies even to the sale, there being a standard procedure for inducing the prospect to sign his name to the agreement and to part with his money. While no express guarantee of success is made at the meetings, and the statement is made that the purchaser must expect to work, the impression which is fostered is of the near inevitability of success to be achieved by anyone who purchases a plan and follows Dare's instructions.
 
 
 14
 "Dare also arranges, in addition to the Adventure Meetings, 'GO Tours,' or 'Golden Opportunity Tours.' Prospects are taken by plane or bus to one of Dare's regional centers where further meetings and sales efforts are undertaken. A significant effort is made during the trip itself to sell the plans to prospects. Much the same atmosphere as at the meetings pervades the trip--exuberant shouting, chanting, handshaking, relating of success stories, and lavish displays of cash.
 
 
 15
 "In a scheme such as this, the possibility that a market will become 'saturated' is a real one. Saturation has in fact occurred in some markets, but this is not mentioned at the meetings. Few, if any, purchasers of these plans have achieved any success remotely approaching that described by defendants and their agents.
 
 
 16
 "B. The role of the purchaser-salesman.
 
 
 17
 "Once he has bought a plan that empowers him to help sell the plans to others, the task of the purchaser is to find prospects and induce them to attend Adventure Meetings. He is not to tell them that Dare To Be Great, Inc. is involved. Rather, he catches their interest by intimating that the result of attendance will be significant wealth for the prospect. It is at the meetings that the sales effort takes place. The 'salesman' is also told that to maximize his chances of success he should impart an aura of affluence, whether spurious or not--to pretend that through his association with Dare he has obtained wealth of no small proportions. The training that he has received at Dare is aimed at educating him on this point. He is told to 'fake it 'til you make it,' or to give the impression of wealth even if it has not been attained. He is urged to go into debt if necessary to purchase a new and expensive automobile and flashy clothes, and to carry with him large sums of money, borrowing if necessary, so that it can be ostentatiously displayed. The purpose of all this is to put the prospect in a more receptive state of mind with respect to the inducements that he will be subject to at the meetings."
 
 
 18
 Id. 474 F.2d at 478-80.
 
 
 19
 From about February to July, 1971, Avco provided loans, secured by promissory notes, to persons who wanted to invest in DTBG. After Avco had made some of these loans, DTBG contacted Avco's manager McCormick about further loan business. McCormick attended three meetings (two for DTBG and one for Koscot, an extremely similar venture run by identical organizers) in May through June, 1971. At these meetings, McCormick provided potential DTBG investors with blank Avco loan application forms. He also made a speech concerning obtaining financing through Avco at one of the meetings. Several members of the plaintiff class testified, and the trial court found, that McCormick represented to some plaintiffs that DTBG was a good quality investment. In July, 1971, McCormick's superior, Pok, ordered him to cease making any loans for investment in DTBG. (McCormick also attended a DTBG "go tour" after Pok put a stop to the loans.) Forty-eight people, eventually certified as a class, borrowed $2,000 or more from Avco to buy DTBG shares over an approximately six month period ending in July, 1971.
 
 
 20
 In the ensuing litigation, the trial court certified the case as a Rule 23(b)(3) class action. After trial, he ruled that both the promissory notes given by the plaintiffs for the loans and the shares of DTBG were "securities" within the meaning of the relevant federal securities statutes. He also found that Avco had solicited the plaintiffs' promissory notes and that the defendants' participation and enthusiasm in the sale of DTBG constituted a "misleading" of the plaintiffs in violation of Secs. 2(3) and 12(2) of the Securities Act of 1933. (15 U.S.C. Secs. 77b(3) and 77l (2), respectively). He entered judgment in favor of the plaintiffs for roughly $167,000, apportioning the judgment among the plaintiff class on the basis of money owed to Avco.
 
 
 21
 Following a bench trial, findings of fact and conclusions of law were filed in which the trial court did not find the requisite scienter by McCormick for Rule 10b-5 liability. He did conclude, however, that DTBG Adventures III and IV were securities within the meaning of the Act and that the efforts of Avco's manager in promoting their sale were sufficient to render Avco liable under Sec. 12(2) of the Securities Act of 1933. He further found that Avco had not met its burden of showing that the representations made by its manager were made with due care. Avco is liable under the doctrine of respondeat superior for its manager's actions in this regard. Holloway v. Howerdd, 536 F.2d 690, 694-5 (6th Cir.1976).
 
 
 22
 This court has reviewed the entire transcript of the trial and concludes not only that the factual findings of the trial judge with regard to the actions and intentions of Avco's manager are not clearly erroneous but that it is in total agreement with them. There was abundant evidence that Avco's manager allowed himself to be duped by the DTBG promoters into facilitating their dubious pyramidal scheme up to the point of actually representing to some of the borrowers that DTBG was a sound investment.
 
 
 23
 The manager, from all that appears in the evidence, was not guilty of any fraudulent intent but rather was taken in by the DTBG hoopla. He apparently swallowed everything from the "money humming" to the thousand dollar bills in the lapel buttonholes. In fact, far from attempting clandestinely to promote a known fraudulent venture, the manager actually suggested to his superiors that Avco adopt some of the DTBG promotional methods in its own public relations. This caused the manager's superiors to make an immediate investigation. In short order, they perceived that the whole DTBG promotion was a chimera, forbade the manager to have anything further to do with it, and prohibited the making of any more loans to DTBG investors.
 
 
 24
 The fact that his supervisors so promptly perceived the inherent fallacy of the DTBG scheme indicates that its defects were obvious and that the manager, although he may have been innocent of fraudulent intent, was certainly guilty of negligence. Nor was his sincerity of any comfort to the bilked investors. One who is sold the Brooklyn Bridge by means of sincere but negligent representations is nonetheless the possessor of a worthless asset.
 
 
 25
 Since the factual findings of the trial judge were clearly supported by the evidence, he was correct in finding liability against Avco, if his conclusion that Avco was liable under Sec. 12(2) was correct. We hold that it was and affirm his conclusion with regard to liability. The case must be remanded, however, for further proceedings on some of the issues, as hereinafter indicated.
 
 ANALYSIS
 Class Action Issues
 
 26
 Defendant contends that the trial court erred in certifying this case as a class action. This contention is without merit. It must be noted that the class was certified only as a F.R.Civ.P. 23(b)(3) class action. For reasons stated in the trial judge's opinion filed when the class was certified, we feel that he was well within his discretion in certifying the class. See Davis v. Avco Corp., 371 F.Supp. 782 (N.D.Ohio 1974). Despite the fact that as the case developed individual questions became more prominent vis a vis common questions of law and fact, there still were and are significant common questions such that we would not be justified in decertifying the class at this late date. See Landy v. Amsterdam, 96 F.R.D. 19, 22 (E.D.Pa.1982); In re Home-Stake Production Co. Securities, 76 F.R.D. 351, 372-73 (N.D.Okla.1977); Fox v. Prudent Resources Trust, 69 F.R.D. 74, 82 (E.D.Pa.1975).
 
 
 27
 What are the Securities Involved in This Case?
 
 
 28
 Plaintiffs launched a multi-front attack in this action, contending both that the notes executed by the plaintiffs to Avco were securities and that the DTBG Adventures were also securities. They asserted liability under Rule 10b-5 and Section 12 of the 1933 Act based on the issuance of both types of "securities." The trial court found liability under Sec. 12(2) on the basis of defendants' involvement with both types of securities. It computed damages apparently on the basis of the moneys lost by plaintiffs in repayment of the loans to Avco.
 
 
 29
 We agree that the DTBG adventures were securities for the reasons discussed below, and that Avco is liable under Sec. 12(2) for having touted them to those plaintiffs who were caused to purchase them by the manager's representations. However, we cannot agree that the notes evidencing the loans from Avco were securities.
 
 
 30
 Although promissory notes can sometimes be considered securities, we think it obvious that the notes executed by the plaintiffs to Avco were not. They were notes executed to a finance company in the ordinary course of its business. The fact that Avco knew the loan proceeds would be used for an investment in DTBG does not in our opinion make the notes securities. Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 938-39 (2d Cir.1984); Exchange National Bank of Chicago v. Touche Ross & Co., 544 F.2d 1126, 1137-38 (2d Cir.1976).
 
 
 31
 We do agree, however, that the DTBG adventures were securities. In this regard we concur with and adopt the analysis in S.E.C. v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.) cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973) and S.E.C. v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.1974). We will not reiterate this analysis in the hope of keeping this opinion to a reasonable length. For reasons hereafter stated, we further hold that Avco is liable to at least some of the investors under Sec. 12(2) on the basis of its manager's efforts to promote DTBG adventures.
 
 Liability Under Sec. 12(2) of the 1933 Act
 
 32
 Determining secondary liability has long been a thorny problem in implementing the securities laws.[1] Particularly is this true with regard to Sec. 12(2). Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 provide a private action remedy roughly equivalent to that existing for fraud at common law. This remedy is not limited to "sellers," but applies also to persons collaterally involved in the transaction who made misrepresentations to promote the sale of securities with the requisite scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In this circuit recklessness may constitute the required scienter. Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1023 (6th Cir.1979); Ingram Industries v. Nowicki, 502 F.Supp. 1060, 1066 (E.D.Ky.1980). However, the trial judge found neither deliberate fraud nor recklessness on the part of Avco or its manager. Therefore, plaintiff's 10b-5 allegations were not supported by the evidence at trial. The trial court's findings of liability must stand or fall on Sec. 12(2) of the 1933 Act.
 
 
 33
 Because of the variety of interpretations that have been given to Sec. 12(2) of the 1933 Act by the various federal courts, it is incumbent upon us to examine its place in the statutory scheme Congress has provided for the protection of investors in securities. Although there is a difference of opinion whether we should limit our inquiry to the statutory language, we must at least begin there. See Touche Ross & Co. v. Redington, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); Admiralty Fund v. Jones, 677 F.2d 1289, 1294 n. 3 (9th Cir.1982); Northwestern Comment, supra note 1, passim. Section 12 of the Securities Act of 1933 (15 U.S.C. Sec. 77l (1976)) provides as follows:
 
 
 34
 "Civil liabilities arising in connection with prospectuses and communications.
 
 
 35
 "Any person who--
 
 
 36
 "(1) offers or sells a security in violation of section 5, or
 
 
 37
 "(2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
 
 
 38
 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." (Emphasis added).
 
 
 39
 Section 2(3) of the 1933 Act (15 U.S.C. Sec. 77b (1976)), in part, provides as follows:
 
 
 40
 "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value. The term 'offer to sell,' 'offer for sale,' or 'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.
 
 
 41
 No definition of the term "seller" is to be found in the Act. It may be immediately discerned that the language of Sec. 12(2)[2] on its face imposes a liability analogous to the equitable remedy of rescission only upon sellers of securities. If we are limited to a literal reading of the statute, it is obvious that the plaintiffs here must fail, because Avco was not in the literal sense the "seller" of DTBG securities.
 
 
 42
 Some courts have indeed held that Sec. 12(2) may be applied only to the literal seller of a security or one in privity with him. Collins v. Signetics Corp., 605 F.2d 110 (3d Cir.1979); McFarland v. Memorex, 493 F.Supp. 631 (N.D.Cal.1980). These courts put great emphasis on the consideration that the securities statutes are indeed statutes, and not mere commissions to the federal courts to ride abroad on a great white horse like the Lone Ranger righting all wrongs. They find support in recent admonitions of the Supreme Court of the United States of like tenor. See, e.g., Touche Ross & Co. v. Redington, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 200-01, 96 S.Ct. 1375, 1384-85, 47 L.Ed.2d 668 (1976). Also, the language of Sec. 12(2) providing for recovery based on the purchase price of the security would seem to support this interpretation.
 
 
 43
 On the other hand the Supreme Court has likewise indicated that the remedial purpose of the securities laws is not to be ignored in their interpretation. Herman & MacLean v. Huddleston, 459 U.S. 375, 103 S.Ct. 683, 689-90, 74 L.Ed.2d 548 (1983). As one commentator has aptly phrased it, the Supreme Court has called for a "flexible yet literal interpretation of the Securities Acts." Vanderbilt Comment, supra note 1, at 386. But cf. Northwestern Comment, supra note 1, passim.
 
 
 44
 Unfortunately, the Supreme Court has not yet synthesized these sometimes antithetical considerations with regard to Sec. 12(2). At one time some courts gave the term "seller" in Sec. 12(2) an extremely broad reading and held that anyone who participates to any degree in the sale of a security by means of negligent misrepresentations may be considered a "seller" thereunder. This view has come into disrepute, however, and has apparently been abandoned. See discussion in S.E.C. v. Murphy, 626 F.2d 633, 650 n. 18 (9th Cir.1980); Vanderbilt Comment, supra note 1 at 367 ff.
 
 
 45
 Still other courts have followed an aiding and abetting analysis with regard to Section 12(2) liability. See, e.g., deBruin v. Andromeda Broadcasting Systems, 465 F.Supp. 1276, 1279-80 (D.Nev.1979); In re Caesars Palace Sec. Lit., 360 F.Supp. 366 (S.D.N.Y.1973). This has been characterized as an "extremely liberal" approach. Vanderbilt Comment, supra note 1 at 364. It may or may not be, inasmuch as at least in this circuit aiding and abetting requires a general awareness that a fraudulent scheme is afoot and knowing and substantial assistance toward the success of that scheme. S.E.C. v. Coffey, 493 F.2d 1304 (6th Cir.1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975). Accord: S.E.C. v. Washington County Utility District, 676 F.2d 218, 226 (6th Cir.1982). It is doubtful whether these elements are present under the facts of this case. In any event the trial court, who followed the approach to Sec. 12(2) liability next discussed, did not use an aiding and abetting analysis. Also, an aiding and abetting theory seems inconsistent with the language of Sec. 12(2). See Ruder II, supra note 1 at 345-46.
 
 
 46
 Inasmuch as we uphold liability under the "proximate cause" theory employed by the trial court, we need not address the issue whether or not an aiding and abetting approach may ever be employed under Sec. 12(2).[3] We think it appropriate to note, however, that to distinguish between an aiding and abetting theory and the other theories advanced is not a mere semantic exercise, as has been suggested by at least one court. In re Caesars Palace Sec. Lit., 360 F.Supp. 366, 380 (S.D.N.Y.1973). A case may be envisioned where there would be Sec. 12(2) liability under a Coffey -type aiding and abetting approach, but not under the analysis we here adopt. We will decide that case if and when it is before us. This case presents the converse situation.
 
 
 47
 The better reasoned cases adopt a view of Sec. 12(2) liability that transcends the strict approach (which limits liability to the literal seller or one in privity with him), which is narrower than the formerly employed broad participation approach and different--whether more conservative or more liberal is debatable--than the aiding and abetting approach.
 
 
 48
 We adopt the theory of Sec. 12(2) liability usually referred to as the "proximate cause" theory. See Vanderbilt Comment, supra note 1, at 370 ff; Ruder II, supra note 1 at 343-45. It has a history that is particularly interesting in the context of this litigation, since it originated in the Northern District of Ohio, which is also the place of origin of this case, although the theory has never been adopted or rejected by this court.
 
 
 49
 The proximate cause theory originated in Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964). There, in language which has since been frequently quoted by courts and commentators alike, the court said:
 
 
 50
 "[L]iability must lie somewhere between the narrow view, which holds only the parties to the sale, and the too-liberal view which would hold all who remotely participated in the events leading up to the transaction. We think that the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant? If the answer is in the affirmative, we would hold him liable. But for the presence of the defendant Roger in the negotiations preceding the sale, could the sale have been consummated? If the answer is in the negative, and we find that the transaction could never have materialized without the efforts of that defendant, we must find him guilty.
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 "The hunter who seduces the prey and leads it to the trap he has set is no less guilty than the hunter whose hand springs the snare. We find that the activity of the corporate defendant's agent Roger is tantamount to that of a 'seller' within the liberal remedial spirit of the securities laws."
 
 
 54
 Lennerth, supra at 65.
 
 
 55
 Other courts, particularly the Fifth Circuit, have not only saluted the flag hoisted by the Lennerth court, but have honored it with ruffles and flourishes on many occasions. See, Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 692-93 (5th Cir.1971); Junker v. Crory, 650 F.2d 1349, 1360 (5th Cir.1981); Croy v. Campbell, 624 F.2d 709, 713 (5th Cir.1980); Stokes v. Lokken, 644 F.2d 779, 785 (8th Cir.1981); S.E.C. v. Murphy, 626 F.2d 633, 650 (9th Cir.1980); Vanderbilt Comment, supra note 1, at 370 ff; Ruder II, supra note 1 at 343-45; Northwestern Comment, supra note 1 at 841-45.
 
 
 56
 For example, the Court of Appeals for the Fifth Circuit, said in Hill York Corporation v. American International Franchises, Inc., 448 F.2d 680, at 692-93:
 
 
 57
 "The law is settled that a purchaser may only recover from his immediate seller.... The law is not settled, however, as to who may be a seller. It is clear that a seller is not required to be the person who passes title. For example, a broker for the seller has been subjected to liability under Section 12(1) as a seller. See III Loss, Securities Regulation 1713 (2d ed. 1961). This Circuit has implicitly rejected the strict privity concept on at least two prior occasions. (citations omitted). Although the term 'seller' has sometimes been accorded a broader construction under Section 12(2) than under Section 12(1), we adopt a test which we believe states a rational and workable standard for imposition of liability under either section. Its base lies between the antiquated 'strict privity' concept and the overbroad 'participation' concept which would hold all those liable who participated in the events leading up to the transaction. (citations omitted). We hold that the proper test is the one previously forged by the court in Lennerth v. Mendenhall, supra. ' * * * the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?' (citations omitted)." (emphasis added).
 
 
 58
 Later cases have broadened application of the proximate cause touchstone to include one whose efforts were a "substantial factor" in the sale of the securities. This has occurred to harmonize the securities law model with a similar development in general tort law. See Pharo v. Smith, 621 F.2d 656, 667 (5th Cir.1980); Junker v. Crory, 650 F.2d 1349, 1360 (5th Cir.1981). See Prosser, Handbook of the Law of Torts, Secs. 41, 42 at 240, 248 (4th ed. 1971). Concerning the meaning of the term "substantial factor," Restatement (Second) of Torts Secs. 432, 433 state:
 
 
 59
 "Sec. 432. Negligent Conduct as Necessary Antecedent of Harm.
 
 
 60
 "(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
 
 
 61
 "(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.
 
 
 62
 * * *
 
 
 63
 * * *
 
 
 64
 'Sec. 433. Considerations Important in Determining Whether Negligent Conduct is Substantial Factor in Producing Harm.
 
 
 65
 "The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:
 
 
 66
 "(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
 
 
 67
 "(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
 
 
 68
 (c) the lapse of time."
 
 
 69
 The Ninth Circuit has described the proximate cause--substantial factor analysis as follows:
 
 
 70
 "In assessing proximate cause, courts focus first on whether a defendant's acts were the actual cause of the injury, i.e., whether 'but for' the defendant's conduct, there would have been no sale. Nicewarner v. Bleavins, supra, 244 F.Supp. at 266 (D.Colo.1965); see Hill York Corp. v. American International Franchises, Inc., supra, 448 F.2d at 693; Lennerth v. Mendenhall, supra, 234 F.Supp. at 65. A finding of 'but for' causation, alone, does not satisfy proximate cause, however. See Nicewarner v. Bleavins, supra, 244 F.Supp. at 266; R. Jennings & H. Marsh, Securities Regulation 1096 (4th ed. 1977); W. Prosser, Handbook of the Law of Torts 238-39, 244 (4th ed. 1971). Prior to the issuance of a security, numerous persons perform mechanical acts without which there could be no sale. For example, a printer may prepare key documents or a bank may advance cash to a customer upon the customer's presentation of any instrument and then pass the instrument to another person. Both would satisfy a 'but for' causation test, but these acts nonetheless do not render the defendants sellers. See First Trust & Savings Bank v. Fidelity-Philadelphia Trust Co., 214 F.2d 320 (3d Cir.1954); Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U.Pa.L.Rev. 597, 646 (1972). Before a person's acts can be considered the proximate cause of a sale, his acts must also be a substantial factor in bringing about the transaction. Lewis v. Walston & Co., Inc., 487 F.2d 617, 621-22 (5th Cir.1973). See Restatement (Second) of Torts Sec. 431 (1965). Thus, a defendant will be held liable as a participant under Sec. 12 if his acts were both necessary to and a substantial factor in the sales transaction. See Lewis v. Walston & Co., Inc., supra, 487 F.2d at 621-22."
 
 
 71
 S.E.C. v. Murphy, 626 F.2d at 650. (Emphasis added).
 
 
 72
 The policy question with which the courts and commentators are struggling may be stated as follows: In light of the fact that the consequence of denominating anyone a "seller" under Sec. 12(2) is to force that person to bear the burden of persuasion in establishing his lack of negligence for representations made by him, what sort of involvement in the sale of a security should be required to justify such inclusion?
 
 
 73
 We hold that considering participants in the selling effort whose acts meet the substantial factor test as described in Murphy, supra, as "sellers" under Sec. 12(2) constitutes an appropriate synthesis of the sometimes antithetical policies that the securities laws are to be construed as statutes while, at the same time, giving effect to their far-reaching remedial purpose.
 
 
 74
 This model does no violence to the statutory scheme and is not contrary to the requirement of scienter for Rule 10b-5 liability. Under Rule 10b-5 scienter is required for imposition of general damages analogous to those recoverable for fraud. Under the proximate cause approach to Sec. 12(2), negligence is required for imposition of the more limited remedy of rescission on one who caused the sale. The approach, therefore, seems to complete the statutory scheme rather than violate it.
 
 
 75
 Some commentators fear that such an approach is too broad, imposing liability on more persons than Congress intended. See Northwestern Comment, supra note 1, passim. However, denominating a defendant a "seller" under Sec. 12(2) does not result in automatic liability. Such a defendant may escape by showing an exercise of ordinary care.
 
 
 76
 We believe that the following considerations are pertinent to an analysis of whether a Sec. 12(2) seller has established this affirmative defense: (1) the quantum of decisional (planning) and facilitative (promotional) participation, such as designing the deal and contacting and attempting to persuade potential purchasers, (2) access to source data against which the truth or falsity of representations can be tested, (3) relative skill in ferreting out the truth (for example, in this case Avco's manager had comparatively greater skill in evaluating judgments based on subsidiary facts, since he performed a similar function in the process of investigating the creditworthiness of borrowers), (4) pecuniary interest in the completion of the transaction, and (5) the existence of a relationship of trust and confidence between the plaintiff and the alleged "seller." These are the circumstances that determine whether a person has exercised due care in this context. See R. Coffey, Securities Regulation: An Analysis of Policy and Law 100ddd-100iii (unpublished multilith manuscript) (1981).
 
 CONCLUSION
 
 77
 Although we agree with the trial court's findings of liability under Sec. 12(2) of the 1933 Act with regard to those class members who did testify that the representations of Avco's manager were the cause of their investing in DTBG, it is necessary that findings of the existence or non-existence of such causal relationship be made with regard to each class member, inasmuch as the circumstances surrounding their individual decisions to invest differ.
 
 
 78
 We wish to make it clear that we are not introducing reliance on the part of the purchasers as a requirement of Sec. 12(2). It is clear that scienter and reliance are not prerequisites for recovery under this section. Wigand v. Flo-Tek, Inc., 609 F.2d 1028, 1034 (2d Cir.1980). The question is the substantiality of the intrusion of Avco's manager into the selling process (that is, his presence at meetings, his making speeches, his furnishing forms, and in general his contribution to the selling momentum). However, in this case the impact of these activities varied from plaintiff to plaintiff.[4] With regard to the plaintiffs that testified, the evidence was more than sufficient to justify the finding that the manager's activities were a substantial factor in their decision to purchase DTBG securities. Avco rightly argues, however, that it has not been established that all of the members of the plaintiff class were affected by the manager's activities.
 
 
 79
 Similarly, the case must be remanded for further findings on damages. The trial court based its damages findings on the theory that the Avco notes were securities, and awarded each class member damages on the basis of the amount he or she lost by reason of the loans. Rather, the damages should have been computed, as required by Sec. 12(2), on the basis of the amount invested in the DTBG adventures we have held to be securities. This did not correspond in every instance with the amount of the loan from Avco. Further, some of the investors did recoup some of their investment by selling the adventures, and this, too, must be considered.
 
 
 80
 Also Avco's manager McCormick is personally liable under the analysis we have herein adopted, and the judgment in his favor must be reversed.
 
 
 81
 Therefore, this case is AFFIRMED with regard to the findings of liability of certain class members under Sec. 12(2) and reversed and remanded for further proceedings indicated herein.
 
 
 82
 LIVELY, Chief Judge, concurring and dissenting.
 
 
 83
 I concur in the majority's conclusion that the district court properly certified this case as a class action. I also concur in the majority's affirmance of the district court's holding that the sales of "adventures" in Dare to Be Great (DTBG) were sales of "securities" within the meaning of federal securities laws. In addition, I concur in the majority's conclusion that the district court erred in holding that the notes from plaintiffs to Avco were "securities" within the meaning of the federal securities laws. Finally, I concur in the majority's affirmance of the district court's finding that there was no liability to the plaintiffs under section 10(b) of the 1934 Act and Rule 10b-5 for lack of proof of scienter.
 
 
 84
 I respectfully dissent, however, from the majority's affirmance of the judgment for the plaintiffs based on the theory that Avco and McCormick were liable as "sellers" of the DTBG adventures under section 12(2) of the 1933 Act. In the first place, though the majority purports to affirm a finding by the district court of liability under section 12(2) I am unable to conclude that this was the basis of the district court's judgment. The district court considered the notes securities, and the whole tenor of its findings and conclusions derives from the erroneous holding that the notes were securities. This is shown most clearly by the measure of damages which the district court applied. The district court granted recovery to the plaintiffs of the amounts paid to Avco on the promissory notes. The recovery is unrelated to the total amounts of their investments in DTBG adventures, yet these were the only securities involved in the transaction. The remedy prescribed for violation of section 12(2) is recovery of "the consideration paid for such security...." 15 U.S.C. Sec. 77l (2) (1970). If the district court intended to find the defendants liable under section 12(2) for sales of the DTBG "adventures," the recovery would necessarily have been related to the amount of the plaintiffs' investments in DTBG, not to the amounts they borrowed from Avco to make these investments. I would reverse the judgment of the district court as being based on the erroneous conclusion that the promissory notes were securities.
 
 
 85
 In my opinion the majority has misread section 12(2) and has reached the wrong result, even if it is assumed that the district court did base its finding of liability on section 12(2). The federal securities laws are complex, but they do display a studied approach to a variety of problems. Different participants in various stages and types of securities transactions are treated individually. In this scheme section 12(2) of the 1933 Act focuses on the liability of persons who offer or sell securities using communications which contain untrue statements or which omit material facts. Only sellers and offerors of securities are reached by section 12(2). Other participants in securities transactions are treated in other provisions of the securities laws. To bring other participants within the reach of section 12(2) by invoking the broad "remedial purposes" of federal securities legislation is contrary to a consistent refusal by the Supreme Court to so construe these statutes. For example in Touche Ross & Co. v. Redington, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979), the Court stated:
 
 
 86
 The invocation of the "remedial purposes" of the 1934 Act is similarly unavailing. Only last Term, we emphasized that generalized references to the "remedial purposes" of the 1934 Act will not justify reading a provision "more broadly that its language and the statutory scheme reasonably permit." SEC v. Sloan, 436 U.S. 103, 116 [98 S.Ct. 1702, 1711, 56 L.Ed.2d 148] (1978); see Ernst & Ernst v. Hochfelder, 425 U.S., at 200 [96 S.Ct. at 1384]. Certainly, the mere fact that Sec. 17(a) was designed to provide protection for brokers' customers does not require the implication of a private damages action in their behalf. Cannon v. University of Chicago, supra [442 U.S.] at 688, and n. 9 [99 S.Ct. at 1953, and n. 9]; Securities Investor Protection Corp. v. Barbour, supra [421 U.S.], at 421 [95 S.Ct. at 1739]. To the extent our analysis in today's decision differs from that of the Court in Borak, it suffices to say that in a series of cases since Borak we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today. Cannon v. University of Chicago, supra [442 U.S.], at 688-709 [99 S.Ct. at 1953-1964]. The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law.
 
 
 87
 In relying on the "proximate cause" theory to treat Avco and McCormick as sellers for purposes of section 12(2) the majority contravenes an express limitation placed by the Supreme Court on application of the federal securities laws. In Touche Ross the Court described reliance on tort principles as a basis for finding a private right of action under the 1934 Act as "entirely misplaced." The Court emphasized that the problems is one of statutory construction, not the application of general principles of substantive law. 442 U.S. at 568, 99 S.Ct. at 2485.
 
 
 88
 I agree with the construction of section 12(2) and the reasoning applied by Judge Aldisert in Collins v. Signetics Corp., 605 F.2d 110, 113 (3d Cir.1979):
 
 
 89
 We have no difficulty in concluding that Congress intended the unambiguous language of Sec. 12(2) to mean exactly what it says: "Any person who--... (2) offers or sells a security ... shall be liable to the person purchasing from him ...." This section is designed as a vehicle for a purchaser to claim against his immediate seller. Any broader interpretation would not only torture the plain meaning of the statutory language but would also frustrate the statutory schema because Congress has also provided a specific remedy for a purchaser to utilize against the issuer as distinguished from the seller of a security. Thus, Sec. 11 gives anyone acquiring a security a specific right of action for misrepresentations against every person who signed the registration statement, or was a director or partner of the issuer or prepared a certified statement contained in the registration statement, or was an underwriter with respect to the security. 15 U.S.C. Sec. 77k.
 
 
 90
 Ascertainment of congressional intent with respect to the standard of liability created by a particular section of the securities acts must "rest primarily on the language of that section." Ernst and Ernst v. Hochfelder, 425 U.S. 185, 200, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). In interpreting liability provisions of the acts, we must respect recent Supreme Court teachings that militate against excessively expansive readings. Thus, proof of an actual purchase or sale rather than a lost opportunity to purchase is necessary to recover for a violation of Rule 10b-5, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and scienter is necessary to establish a 10b-5 violation, Ernst & Ernst v. Hochfelder, supra. A defeated tender offeror has no implied cause of action for damages under Sec. 14(e) of the Securities Exchange Act of 1934 or under Rule 10b-5. Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 42, 97 S.Ct. 926 , 51 L.Ed.2d 124 (1977). Without allegations of manipulation or deception, no 10b-5 cause of action exists for simple breach of fiduciary duty to minority stockholders. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Section 12(k) of the Exchange Act does not authorize the Commission to suspend trading in a security for more than one ten-day period on the basis of a single set of circumstances, SEC v. Sloan, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), and an employees' non-contributory, compulsory pension plan is not a security within the meaning of the Securities Acts, International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979).
 
 
 91
 One other comment appears in order. Avco and McCormick obviously were not sellers or offerors of DTBG adventures. Yet the majority holds them liable as indirect participants whose activities were a substantial factor in the transactions between the plaintiffs and DTBG. In Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that secondary liability may not be imposed under section 10(b) for mere negligence; scienter is required. The majority has found that there was no scienter, and thus no Rule 10b-5 liability. By permitting recovery under section 12(2) on the basis of McCormick's failure to show that he would not have known of the fraudulent nature of the DTBG scheme even if he had exercised reasonable care, the majority permits the plaintiffs to evade the Ernst & Ernst requirement that secondary liability may be based only on scienter.
 
 
 92
 I would reverse the judgment of the district court.
 
 
 
 *
 Hon. William O. Bertelsman, Judge, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 See, generally, Kaminsky, An Analysis of Securities Litigation Under Section 12(2) and How It Compares with Rule 10b-5, 13 Hous.L.Rev. 231 (1976); Rapp, Expanded Liability Under Section 12 of the Securities Act: When Is a Seller Not a Seller? 27 Case W.Res.L.Rev. 445 (1977); Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, 120 U.Pa.L.Rev. 597 (1972) [hereinafter cited as Ruder I ]; Ruder, Securities Law Secondary-Liability Theories, in Fourteenth Annual Institute on Securities Regulation 331 (1983) [hereinafter cited as Ruder II ]; Comment, Secondary Liability under Section 12(2) of the Securities Act of 1933, 78 Nw.L.Rev. 832 (1983) [hereinafter cited as Northwestern Comment ]; Comment, Seller Liability Under Section 12(2) of the Securities Act of 1933: A Proximate Cause-Substantial Factor Approach Limited by a Duty of Inquiry, 36 Vand.L.Rev. 361 (1983) [hereinafter cited as Vanderbilt Comment]
 
 
 [2]
 It has been suggested that because of the strict liability imposed in Sec. 12(1), the definition of seller should be more narrowly applied than in Sec. 12(2), where due care is a defense. Since we find liability here under Sec. 12(2), we limit our analysis to it and express no opinion as to the proper interpretation of Sec. 12(1). See Pharo v. Smith, 621 F.2d 656, 665 n. 6 (5th Cir.1980)
 
 
 [3]
 Judge Lambros in a decision that primarily involved a pleading question has suggested that using the aiding and abetting approach under Sec. 12 might be appropriate. Sandusky Land Ltd. v. Uniplan Groups, Inc., 400 F.Supp. 440, 444 (N.D.Ohio 1975). But see Wright v. Schock, 571 F.Supp. 642, 658 (N.D.Cal.1983); Hokama v. E.F. Hutton Co., 566 F.Supp. 636, 642 (C.D.Cal.1983)
 
 
 [4]
 In many cases the contribution of the defendant to the selling effort may be so great that it may be considered a substantial factor in the sales made to all plaintiffs