**Harold MERCER, et al., Plaintiffs,**

v.

**JAFFE, SNIDER, RAITT AND HEUER, P.C., et al., Defendants.**

**Mohamed ABDORABEHE, et al., Plaintiffs,**

v.

**JAFFE, SNIDER, RAITT AND HEUER, P.C., et al., Defendants.**

**Nos. G88–380 CA1, G88–582 CA1.**

United States District Court, W.D. Michigan, S.D.

May 3, 1989.

---

Tolley, Fisher & Verwys, P.C. by Thomas F. Koernke, Todd R. Dickinson and James B. Doezema, Grand Rapids, Mich., for plaintiffs.

Morton H. Collins, Collins Einhorn & Farrell, Southfield, Mich., for Jaffe, Snider, Raitt and Heuer, P.C., Peter Sugar and David Warner.

Frank J. Kelley, Atty. Gen. by Ronald W. Emery, Asst. Atty. Gen., Tort Defense Div., Lansing, Mich., for Frederick Hoffecker.

Frank J. Kelley, Atty. Gen. by John D. Walter, Asst. Atty. Gen., Executive Div., Lansing, Mich., for James Karpen.

## OPINION

HILLMAN, Chief Judge.

These actions are brought by approximately five hundred investors who lost money in the so-called Diamond Mortgage Corporation/A.J. Obie and Associates securities fraud. Plaintiffs sue two distinct sets of defendants. At all times relevant to these suits, defendants Peter Sugar and David Warner were attorneys at a Detroit law firm, defendant Jaffe, Snider, Raitt & Heuer, P.C. (the Jaffe defendants). Defendants James Karpen and Frederick Hoffecker (the state defendants) were respectively the Director of Enforcement of the Michigan Corporations and Securities Bureau, and the Assistant Attorney General in charge of the Michigan Attorney General's Consumer Protection Division.

The parties agree that these actions are identical in all respects, except they involve different plaintiffs. The court will therefore treat the actions as one for purposes of this opinion. The court's use of the term "complaints" refers to the first amended complaint filed in case number G88–380 CA1, and the amended complaint filed in case number G88–582 CA1.

The matter is before the court on motions to dismiss brought under Fed.R.Civ.P. 12(b)(6) by both the Jaffe defendants and the state defendants. The parties have ably briefed the legal issues, and the court has carefully considered all the arguments and authorities relied upon in the various briefs. In addition to consideration of the motions, the court will also address several matters made material by the status conference held in these cases on March 17, 1989.

### I. Statement of Facts

The complaints in these cases contain ten counts. Each count, based upon the general allegations of the complaint and more specific allegations pertinent to that count, attempts to set forth a cause of action under the federal securities statutes, Michi-

gan statutes, or Michigan common law. The court will briefly summarize the complaints' main allegations.

Diamond Mortgage Corporation (Diamond) began doing business as a mortgage broker in 1973. In 1980, Diamond's owners formed Commerce Mortgage Investments, Ltd. (CMI), a real estate investment trust. Around the same time, Diamond's owners gained control of A.J. Obie and Associates (Obie), a securities broker. Obie sold securities for and on behalf of Diamond and CMI.

As early as 1979, public complaints about the Diamond entities' business practices brought those practices under state governmental scrutiny. In October of 1980 the Michigan Corporations and Securities Bureau (MCSB) began administrative proceedings against Obie based on alleged violations of Michigan securities law. In November 1981 the MCSB charged Diamond with similar violations.

As a result of these charges and proceedings, Diamond and the MCSB entered into a November 30, 1981 consent order in which Diamond undertook to correct previous irregularities and bring its operations into compliance with state law. Sugar and Warner represented the Diamond entities' interests at the negotiation of the consent order. A Jaffe, Snider representative approved the order's final form and content.

Despite Diamond's promises, the Diamond entities did not comply with the consent order, and continued to violate state and federal law requirements. For example, the entities ignored regulatory formalities imposed by the consent order and the law, such as the submission of accurate financial documents and sales reports to appropriate state officials.

At the heart of their complaint, plaintiffs allege that the Diamond entities offered or sold securities by means of circulars, advertisements, and other promotional literature which stated that Diamond or CMI securities were fully backed by mortgages, when they were not, or failed to state that mortgages backing some securities were invalid or had been assigned to more than one investor. As a consequence of these fraudulent representations, and in reliance upon the fact or belief that the Diamond entities had been permitted to operate by state officials after investigation and imposition of appropriate restrictions and supervision, numerous investors, including plaintiffs in these cases, were induced to purchase Diamond or CMI securities that are now worthless.

After November 30, 1981, it is alleged Sugar and Warner "took an active role" in furthering the Diamond entities' activities. They had "a general awareness, or were reckless in not knowing," that their contributions furthered the Diamond entities' fraud. Plaintiffs further contend that Sugar and Warner falsely assured state officials that the Diamond entities were in substantial compliance with the consent order. In addition, Sugar and Warner also convinced state officials that any deviation from the consent order by the Diamond entities, such as the failure to submit financial statements to the state, was either immaterial or not harmful to the investing public.

Sugar and Warner additionally represented to state officials that they had diligently examined the Diamond entities, and were satisfied that the entities' practices were truthful and in accordance with applicable law. They in fact "knew or were reckless in not knowing" that they had not performed with due diligence, and that the Diamond entities' activities were illegal.

Finally, it is claimed Sugar and Warner assisted in preparing the Diamond entities' security offering circulars, and took an active role in approving advertising and promotional literature used by the Diamond entities in offering or selling securities. Sugar and Warner "knew or recklessly failed to know" that the securities promotions were false. At no time did either Sugar or Warner disclose his knowledge of the Diamond/Obie fraud to state regulatory officials or the investing public.

Plaintiffs claim that since at least 1980, Karpen and Hoffecker "knew or should have known" of the Diamond entities' violations of the law and the consent order. Karpen allegedly "failed to discover, or

discovered and ignored," those violations. After 1981, Hoffecker or his subordinates received investor complaints including information that Diamond entities were selling notes allegedly secured, but in fact not secured, by valid mortgages. Despite Hoffecker's knowledge of the Diamond fraud, plaintiffs assert, he failed to take proper action on those complaints. Had Karpen and Hoffecker demanded compliance with the law and the consent order, plaintiffs believe the Diamond entities would have been shut down by the state.

## II. Motions to Dismiss

### A. Standard of Review.

The Sixth Circuit recently summarized the standard this court must use in reviewing defendants' Rule 12(b)(6) motions:

A Rule 12(b)(6) motion tests whether a cognizable claim has been pleaded in the complaint. Rule 8(a) sets forth the basic federal pleading requirement that a pleading "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." The familiar standard for reviewing dismissals under Rule 12(b)(6) is that "the factual allegations in the complaint must be regarded as true. The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983) (citing *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), and *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984).

Although this standard for Rule 12(b)(6) dismissals is quite liberal, more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements. 5 C. Wright & A. Miller, Federal Practice & Procedure § 1357 at 596 (1969). "In practice, 'a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal

theory.'" *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984) (quoting *In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir. 1981), *cert. dismissed*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *see also Sutliff, Inc. v. Donovan Cos.*, 727 F.2d 648, 654 (7th Cir.1984); 5 C. Wright & A. Miller, Federal Practice & Procedure § 1216 at 121–23 (1969). As the First Circuit stated,

[w]e are not holding the pleader to an impossibly high standard; we recognize the policies behind rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*O'Brien v. DiGrazia*, 544 F.2d 543, 546 n. 3 (1st Cir.1976) *cert. denied*, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977).

*Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436–37 (6th Cir.1988).

### B. Jaffe Defendants.

The Jaffe defendants point out alleged deficiencies in virtually every aspect of the complaints. Sugar and Warner are named in Counts II–X. Jaffe, Snider is mentioned by name only in Counts III, VII, VIII, and IX, but is presumably included in the remaining counts by means of requests for judgment against "all defendants." The court will address the motion to dismiss count by count.

In Count II, plaintiffs allege that all defendants "secondarily" violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 771(2). Section 12(2) states in pertinent part that

[a]ny person who offers or sells a security ... by the use of any means ... in interstate commerce ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the state-

ments, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue ... to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

The court concludes that Count II's factual allegations regarding the Jaffe defendants' misrepresentations to state officials, and their participation in preparing and approving the Diamond entities' offering circulars, advertising and promotional literature, are legally insufficient to state a violation of section 12(2). The allegations do not show either directly or inferentially that the Jaffe defendants are person "from" whom plaintiffs "purchased" securities within the meaning of the statute.

In *Pinter v. Dahl,* —— U.S. ——, 108 S.Ct. 2063, 2077–78, 100 L.Ed.2d 658 (1988), the Supreme Court made plain that the section 12 "purchase from" requirement is defined by reference to common usage. If a buyer would commonly think or say that he had "purchased" securities from someone, such as a vendor or vendor's agent who solicited the sale, then the statutory requirement is met. *Id.* Plaintiffs' Count II allegations fail because, quite obviously, buyers commonly do not say that they purchased securities from lawyers or law firms that helped to prepare promotional material or offering statements. *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1114 (5th Cir.1988), *pet. for cert. filed sub nom. Abell v. Wright, Lindsey & Jennings,* 57 U.S.L.W. 3636 (U.S. March 14, 1989) (No. 88–1518) (summarized at 57 U.S.L.W. 3696).

The court is aware that *Pinter* expressly involved section 12(1) of the 1933 Act, not section 12(2). Nevertheless, *Pinter* teaches that the primary consideration in construing the 1933 Act is the plain language of the statute. 108 S.Ct. 2082. The "purchase from" language of section 12 applies identically to both subsections. Accordingly, despite the fact that section 12(1) imposes strict liability, and 12(2) employs a fault standard, the textual analysis is the same. Every appellate court that has considered the question has determined that *Pinter* applies to section 12(2) claims. *Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126–27 (2nd Cir.1989); *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 940 (7th Cir.1989); *Abell,* 858 F.2d at 1115. The court is confident that the Sixth Circuit will rule likewise.

Plaintiffs contend that Count II adequately pleads a section 12(2) claim under *Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985). That case holds that a participant in a securities sale will be deemed an "offeror" or "seller" potentially liable under section 12(2) if his or her acts are a "substantial factor" in bringing about the sale. 739 F.2d at 1065–67. *Pinter,* however, severely criticized the "substantial factor" test. 108 S.Ct. at 2079–82. Significantly for this case, the *Pinter* court stated that

[t]he deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme.... Indeed, [the test] might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person.

*Id.* 108 S.Ct. at 2081, 2082. In light of this criticism, *Davis* is no longer good law. Count II will be dismissed for failure to state a claim.

■ Count III charges the Jaffe defendants with the "primary" violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and S.E.C. Rule

10b–5, 17 C.F.R. 240.10b–5, promulgated thereunder. Count IV charges all defendants with aiding and abetting 10b–5 violations by the Diamond entities. Rule 10b–5 states that

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

■ The court is satisfied that plaintiffs have stated viable causes of action in both Count III and Count IV. As to Count III, 10b–5 primary liability requires direct participation in the deceit at issue. *Moore v. Fenex, Inc.*, 809 F.2d 297, 305 (6th Cir.), *cert. denied sub nom. Moore v. Frost*, 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987). A person undertaking to furnish information which contains a material misstatement or omission is a primary participant, so long as he or she is not so far removed from the transmission of the misleading information that liability would necessarily become vicarious. *SEC v. Washington Co. Utility Dist.*, 676 F.2d 218, 223–24 (6th Cir.1982).

■ As to Count IV, "a person may be held as [a 10b–5] aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *Moore*, 809 F.2d at 303.

Counts III and IV allege that the Jaffe defendants "knowingly or in reckless dis-

regard of the truth" lied to state officials about 10b–5 violations by the Diamond entities. The parties in these actions are aware of the court's opinion on a similar motion to dismiss decided some time ago in the related case of *Schriemer v. Greenburg*, case number G87–56 CA1. As the court stated in *Schriemer*, allegations "that ... attorneys, knowing of the alleged unlawful activities of the principals, went ahead and lied on behalf of their clients to the State of Michigan's Securities Enforcement Bureau.... [are] enough under *Moore* to state [an aiding and abetting] cause of action." Opinion at 23.

Counts III and IV additionally allege that the Jaffe defendants "knowingly or in reckless disregard of the truth" approved or assisted in the preparation of false and misleading offering circulars, advertising, and promotional literature used by the Diamond entities. This alleged conduct certainly qualifies as "furnishing" or "supplying" information to potential investors in a sufficiently direct manner to impose 10b–5 primary liability under *Washington Co. Utility Dist.* See 676 F.2d at 223, 224. Of course, the conduct also furnishes an alternative basis for imposing aider and abettor liability under *Moore.*

■ The Jaffe defendants contend that Counts III and IV must fail because plaintiffs' allegations that the former "knew or recklessly failed to know" of the Diamond fraud do not satisfy the scienter requirements of a 10b–5 violation. The court disagrees. While the "knowing or reckless" language may not be unequivocal, it must be construed liberally in plaintiffs' favor for purposes of a motion to dismiss. *See, e.g., Kent v. Johnson*, 821 F.2d 1220, 1223 (6th Cir.1987).

The court will therefore read the allegations in the disjunctive: the Jaffe defendants knew of the fraud, or alternatively, were reckless in not knowing. Regardless of the legal status of 10b–5 claims based on recklessness, plaintiffs' 10b–5 claims based on the Jaffe defendants' alleged knowingly false statements to state officials, and to investors who read the Diamond entities'

promotional materials, are sufficient to survive dismissal at this early stage under the Sixth Circuit case law previously discussed.

■ The Jaffe defendants argue next that Counts III and IV fail to set forth their alleged fraudulent conduct with sufficient particularity to satisfy Fed.R.Civ.P. 9(b). The court agrees that the complaints do not contain a significant portion of the who, what, when, and where of each individual plaintiff's alleged defrauding by the Jaffe defendants. Nevertheless, this court does not favor the strict application of Rule 9(b) in complex securities fraud cases. *See Schriemer* opinion at 24–25. The Sixth Circuit shares this flexible approach to Rule 9(b). *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679–81 (6th Cir.1988).

The allegations in Counts III and IV are sufficient to provide the Jaffe defendants fair notice that plaintiffs claim 10b–5 liability based on the alleged false statements previously described. Plaintiffs have at least generally set forth the nature of those statements, and the reasons why they were false or misleading. They have similarly stated the Jaffe defendants' fraudulent intent, reliance on the fraud, and the resulting injury. The facts pleaded amount to more than a bare legal conclusion. *See Michaels Bldg. Co.* 848 F.2d at 679.

Moreover, discovery has not yet begun in these cases, and the Jaffe defendants themselves control many of the precise details of their relationship with the Diamond entities and state regulators. Under these circumstances, it would be unfair to dismiss plaintiffs' complaints without providing them the opportunity to flesh out their claims. If it appears during the course of discovery that plaintiffs cannot prove their 10b–5 claims, the court will entertain a timely summary judgment motion. Similarly, if it emerges that plaintiffs have accused the Jaffe defendants of fraud without any reasonable factual basis, the court stands ready to impose Rule 11 sanctions. *See Id.* at 680–81.

■ The Jaffe defendants finally assert that the 10b–5 claims in Counts III and IV are time-barred. In the Sixth Circuit, the courts look to state law for the limitations period applicable to 10b–5 actions. Michigan's six year statute of limitations for common law fraud, M.C.L.A. § 600.5813, governs here. *IDS Progressive Fund, Inc. v. First of Michigan Corp.*, 533 F.2d 340, 344 (6th Cir.1976). Michigan's two year fraudulent concealment statute, M.C.L.A. § 600.5855, qualifies the six year limitation period. *Benoay v. Decker*, 517 F.Supp. 490, 496 (E.D.Mich.1981), *aff'd without opinion*, 735 F.2d 1363 (6th Cir.1984). The Jaffe defendants do not argue that any plaintiff brought his or her 10b–5 claim here more than two years after that plaintiff discovered or should have discovered the relevant fraud.

Instead, the Jaffe defendants urge this court to abandon the six year limitation period of *IDS Progressive Fund* and embrace the shorter period adopted by the Third Circuit in *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3rd Cir.) (*en banc*), *cert. denied sub nom. Vitiello v. I. Kahlowsky & Co.*, ––– U.S. –––, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). *Data Access* holds that where a federal cause of action does not carry its own limitation provision, recent Supreme Court decisions demonstrate a willingness to depart from the custom of applying state statutes of limitations, and to borrow analagous limitations provisions from federal law, where appropriate. Taking this nontraditional approach, the *Data Access* court concluded that it is more appropriate to look to other sections of the federal securities laws, rather than state law, when choosing a limitations period for implied causes of action under Rule 10b–5. The *Data Access* court thus concluded that 10b–5 claims should be governed by a limitations period of three years after the fraud or one year after discovery of the relevant facts. 843 F.2d at 1539–50.

The court declines the invitation to follow *Data Access*. Unlike the situation with *Pinter* and *Davis* discussed in reference to plaintiffs' section 12(2) claims, *Data Access* does not directly affect the continuing viability of the Sixth Circuit's holding in *IDS*

*Progressive Fund*, and its borrowing of the six year Michigan statute of limitations. This is because none of the Supreme Court decisions discussed in *Data Access* directly involved the question of 10b–5 limitations. Accordingly, this court is bound by existing Sixth Circuit precedent. The court notes that Judge Enslen recently reached the same decision. *Katz v. First of Michigan*, No. K87–264 CA, slip op. at 6–7 1989 WL 62196 (W.D.Mich. March 13, 1989).

■ The Jaffe defendants argue persuasively that if this court is not willing to follow the *Data Access* rule, it should certify the limitations question for interlocutory appeal under 28 U.S.C. § 1292(b), to give the Sixth Circuit an opportunity to reconsider *IDS Progressive Fund* in light of *Data Access* and the Supreme Court cases discussed therein. In the final analysis, however, the court believes that certification is unwarranted. At least one district court has likewise refused to certify this question for interlocutory appeal. *TCF Banking and Savings, F.A. v. Arthur Young & Co.*, 697 F.Supp. 362, 366–67 (D.Minn.1988).

Under section 1292(b), certification for interlocutory appeal is proper if the district court's order "involves a controlling question of law as to which there is substantial ground for difference of opinion and ... an immediate appeal from the order may materially advance the ultimate termination of the litigation." The court does not view *Data Access* as providing "substantial ground for difference of opinion" as to whether the Sixth Circuit will uphold this court's decision to apply the six year limitations period to plaintiffs' 10b–5 claims under *IDS Progressive Fund.*

The six year Michigan rule for 10b–5 claims has been the settled law in this circuit for twenty-two years. *See Charney v. Thomas*, 372 F.2d 97, 99–100 (6th Cir. 1967). The majority of courts that have addressed the state/federal limitations borrowing issue after *Data Access*, including one circuit court of appeals, have either implicitly or explicitly rejected the Third Circuit's approach, and continued to apply state law in the traditional manner. *Dur-*

*ham v. Business Mngmt. Associates*, 847 F.2d 1505, 1508 (11th Cir.1988); *Heineman v. S & S Machinery Co.*, 707 F.Supp. 86, 88 (E.D.N.Y.1989); *TCF Banking and Savings*, 697 F.Supp. at 364–66; *Robin v. Doctors Officenters Corp.*, 686 F.Supp. 199, 206–07 (N.D.Ill.1988). *Contra, Bath v. Bushkin, Gaims, Gaines and Jonas*, 695 F.Supp. 1156, 1159–62 (D.Wyo.1988). Under these circumstances, the court is satisfied that the likelihood of the Sixth Circuit's overruling *IDS Progressive Fund* and reversing this court's order is not "substantial."

Moreover, the court notes that at this writing the Supreme Court has before it the following question: "[h]ow should courts choose limitations periods for implied causes of action for Sections 10(b) and 14(e) of 1934 Securities and Exchange [sic] Act?" *Lebman v. Aktiebolaget Electrolux*, 854 F.2d 1319 (5th Cir.1988), *petition for cert. filed*, 57 U.S.L.W. 3488 (U.S. Nov. 28, 1988) (No. 88–1114) (summarized at 57 U.S.L.W. 3595). The Court has asked the Solicitor General to brief the question. 57 U.S.L.W. at 3619. It thus appears somewhat more likely than in the general run of cases that the Court will agree to hear *Lebman*. If the Court indeed grants certiorari, then of course its decision would moot any Sixth Circuit ruling on the issue the Jaffe defendants wish to certify in this case. The possibility of a decision in *Lebman* thus makes it less likely that an interlocutory appeal here would "materially advance the ultimate termination" of this litigation within the meaning of 28 U.S.C. § 1292(b).

In summary, the court holds that plaintiffs have adequately pled 10b–5 claims against the Jaffe defendants, and that those claims are not time-barred. The court declines to certify an interlocutory appeal on the 10b–5 limitations issue. The Jaffe defendants' motion to dismiss Counts III and IV will be denied.

■ In Counts V and VI plaintiffs charge the Jaffe defendants with secondary violations of section 410 of the Michigan Uniform Securities Act, M.C.L.A. § 451.810. Count V relies upon an aiding

and abetting theory, while Count VI alleges that the Jaffe defendants' conduct was a "necessary and substantial factor" in the Diamond entities' illegal securities sales. Plaintiffs do not specify upon which subsection of section 410 their causes of action rest, but the language of Counts V and VI convinces the court that the claims are based on section 410(a). Plaintiffs make no effort to allege that the Jaffe defendants properly belong within one of the categories of potentially liable persons described in section 410(b).

The language of section 410(a) tracks that of section 12(2) of the 1933 Securities Act. Courts accordingly apply section 12(2) analysis to section 410(a) claims. *See, e.g., Chelsea Associates v. Rapanos,* 527 F.2d 1266, 1272–73 (6th Cir.1975); *Dept. of Commerce v. DeBeers Diamond Investment, Ltd.,* 89 Mich.App. 406, 280 N.W.2d 547, 550 (1979). As to Count V, the Sixth Circuit has stated that "an aiding and abetting theory seems inconsistent with the language of § 12(2)." *Davis,* 739 F.2d at 1065. Other courts agree. *See Schlifke,* 866 F.2d at 942 (collecting cases). Finally, this court has specifically held that "there is no aider and abettor liability under M.C.L.A. § 451.810(a)." *Schriemer* opinion at 31.

As to Count VI, the "substantial factor" theory fails under section 410(a) for the reasons discussed in connection with plaintiffs' section 12(2) claims brought in Count II. Counts V and VI will be dismissed for failure to state a claim.

■ Count VII alleges common law fraud. In *U.S. Fidelity and Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77, 82 (1981), the Michigan Supreme Court approved the following formulation of the common law fraud rule:

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.

Count VII states a claim against the Jaffe defendants under this rule.

The court rejects the Jaffe defendants' arguments that plaintiffs have not pled fraud with sufficient particularity for the reasons given above in connection with Counts III and IV. The parties agree that Count VII, like the complaints as a whole, alleges two separate sets of statements: those made by the Jaffe defendants to state officials about the Diamond entities' operations, and those made by the Jaffe defendants in preparing and approving the Diamond entities' promotional materials.

The Jaffe defendants contend that the first set of statements cannot be fraudulent because they cannot satisfy *U.S. Fidelity and Guaranty Co.'s* fourth and fifth requirements. In other words, the Jaffe defendants assert, plaintiffs as a matter of law cannot show that the Jaffe defendants intended plaintiffs to rely on statements made by the Jaffe defendants to third-party state officials, and likewise cannot show that reliance actually occurred.

The court disagrees. In *Cormack v. American Underwriters Corp.,* 94 Mich. App. 379, 288 N.W.2d 634, 637 (1979), the Michigan Court of Appeals made plain that a fraud claimant may rely upon misrepresentations made by a defendant to a third party with the intent to induce reliance by the claimant. In such cases, the third party stands as a conduit of the misrepresentations. The cases cited by the Jaffe defendants in opposition to this principle are inapposite. Both *Greenville Nat. Bank v. Nat. Hardwood Co.,* 241 Mich. 524, 527, 217 N.W. 786 (1928), and *Kahn v. Burman,* 673 F.Supp. 210, 215 (E.D.Mich.1987) involved the question whether the defendants in fact intended plaintiffs to rely on representations made to third parties, not whether such intent is legally cognizable.

*Cf. N. Feldman & Son, Ltd. v. Checker Motors Corp.,* 572 F.Supp. 310, 316 (S.D.N.Y.1983) (applying *Cormack* in finding cognizable fraud claim under Michigan law based upon representations made to third party and relayed to plaintiff; issues of requisite intent, whether representations were in fact made, and reliance cannot be resolved on summary judgment).

In light of *Cormack,* Count VII's allegations that the Jaffe defendants made knowingly false statements to state officials, intending persons in plaintiffs' position to rely on those statements, and that plaintiffs did in fact so rely, state a claim for common law fraud under Michigan law. This ruling is consistent with the court's comments in *Schriemer.* Opinion at 45.

Turning to the second group of statements alleged in Count VII, the Jaffe defendants are in error when they characterize the statements made by them in preparing and approving the Diamond entities' promotional materials as mere failures to disclose. Count VII alleges that the Jaffe defendants made affirmatively misleading representations in the materials, such as statements that securities were backed by mortgages, when they in fact were not. The promotional materials portion of Count VII therefore amounts to more than a claim for silent fraud, and the fact the plaintiffs were not in privity of contract with the Jaffe defendants is immaterial. This portion of Count VII likewise satisfies the requirements of *U.S. Fidelity and Guarantee Co.* set forth above.

■ Count VIII purports to state a claim against the Jaffe defendants for negligent misrepresentation based upon the statements they made to state officials and in the Diamond promotional material they prepared and approved. However, the complaints allege that the Jaffe defendants had an attorney/client relationship with the Diamond entities, not with plaintiffs.

In Michigan, an attorney owes no duty of due care to his client's litigation adversary, because such a duty would create an unacceptable conflict of interest for the attorney, to the damage of the attorney/client relationship and the adversarial system.

*Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585, 590–93 (1981) (Levin, J., for unanimous court on issue of attorney's duty). The court believes that the same reasoning applies where, as here, a lawyer represents his or her client in the potentially adversary context of an arm's length business transaction. *See American Employers' Ins. Co. v. Medical Protective Co.,* 165 Mich.App. 657, 419 N.W.2d 447, 448–49 (1988). The Jaffe defendants owed no actionable duty to plaintiffs under Michigan negligence law.

Plaintiffs argue that a panel of the Michigan Court of Appeals "implicitly" recognized a cause of action against an attorney for negligent misrepresentation in *City Nat. Bank of Detroit v. Rodgers & Morgenstein,* 155 Mich.App. 318, 399 N.W.2d 505 (1986), *lv. denied,* 428 Mich. 885 (1987). That case, however, does not discuss the issue of an attorney's duty, and holds only that a negligent misrepresentation action must be based upon an assertion of fact rather than opinion. 399 N.W.2d at 507.

Even if *City Nat. Bank* stood for the proposition plaintiffs assert, it would not save Count VIII. A federal district court ruling upon novel issues of state law in areas of important state policy requires unmistakable and precise authority to depart from a settled approach taken by the state's highest court. Accordingly, this court would require more than the supposed "implicit" authority of *City Nat. Bank* to deviate from *Friedman*'s teaching that an attorney owes no duty of due care to his client's adversary. Plaintiffs' citation of cases from outside Michigan is unavailing for the same reason. Count VIII will be dismissed for failure to state a claim. The court notes that this disposition mirrors the result, if not the reasoning, of *In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583, 596–98 (E.D. Mich.1985).

■ Count IX charges the Jaffe defendants with violation of the Michigan Consumer Protection Act, M.C.L.A. § 445.901 *et seq.* In *Schriemer* this court held that "the sale of securities is not.... activit[y] ... regulated by the [Michigan Consumer

Protection] Act." Opinion at 41. The court's ruling harmonizes with the "overwhelming" majority of decisions declining to apply general state consumer protection statutes to the securities field. *See Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1309, 1322, 1337–38 (M.D.Tenn. 1989) (collecting cases). Nothing in the Consumer Protection Act or state case law suggests to the court that Michigan does not share this majority view.

Plaintiffs' reliance upon *Ramson v. Layne,* 668 F.Supp. 1162 (N.D.Ill.1987), is unpersuasive. That case involved the issue of whether or not Lloyd Bridges could be held liable as an "endorser" of Diamond/Obie investments under the Illinois Consumer Fraud and Deceptive Practices Act. 668 F.Supp. at 1163–70. The court did not specifically address the propriety of applying the general Illinois statute to the sale of securities. Moreover, the Illinois statute defines covered business conduct in a far less qualified manner than the Michigan Consumer Protection Act. *Compare* Ill.Rev.Stat. ch. 121½, § 261(f), with M.C.L.A. § 445.902(d). Count IX will be dismissed for failure to state a claim.

In Count X, plaintiffs plead a common law civil conspiracy. In Michigan, "[a] conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Fenestra Inc. v. Gulf American Land Corp.,* 377 Mich. 565, 141 N.W.2d 36, 48 (1966). The focus of a civil conspiracy claim is the damage, not the conspiracy itself. Thus, conspiracy allegations not attached to allegations of a substantive wrong are not actionable. *Fenestra,* 141 N.W.2d at 49.

Here, as the court has explained, plaintiffs adequately state claims against the Jaffe defendants for common law fraud and 10b–5 violations. Count X additionally contains all the necessary elements of a conspiracy claim. Plaintiffs allege that all defendants acted in concert to ensure the viability of the Diamond entities, a lawful purpose, by committing or aiding and abetting fraud, an unlawful means. The court

rejects the Jaffe defendants' objections to Count X on particularity grounds, for the reasons stated above in the discussion of Count III's and Count IV's sufficiency under Fed.R.Civ.P. 9(b). The motion to dismiss Count X will be denied. Again, this action comports with the court's decision in *Schriemer.* Opinion at 45.

### C. State Defendants.

The complaints do not specify whether plaintiffs mean to sue the state defendants in their individual or official capacities. However, plaintiffs' brief states that this suit is brought against Karpen and Hoffecker individually. An official capacity suit, of course, is barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 168–70, 105 S.Ct. 3099, 3106–08, 87 L.Ed.2d 114 (1985)

Plaintiffs seek judgment against the state defendants only on the claims set forth in Counts I, II, IV, V, VI, and X. The court will dismiss those portions of Counts II, V, and VI that involve the state defendants for the reasons given above in dismissing the same counts against the Jaffe defendants. Accordingly, the court need only address Counts I, IV, and X in connection with the state defendants.

Count I is pled in a very confusing manner, and plaintiffs' brief does not dispel much of the confusion. According to the brief at page 40, "[a]t Count I plaintiffs allege that Hoffecker and Karpen were negligent." The court takes this statement as an invitation by plaintiffs to ignore Count I's references to the state defendants' alleged "bad faith," because bad faith denotes an intentionality or deliberation standard that does not belong in a negligence count. Despite this seeming invitation, however, plaintiffs argue at pages 48 and 49 of their brief that the allegation of Karpen's and Hoffecker's bad faith saves all their state-law claims from dismissal on grounds of governmental immunity. This argument assumes that Count I alleges more than negligent conduct by the state defendants.

In any event, Count I fails as a matter of law whether it is read to allege either negligence or bad faith. In both cases, plaintiffs seek to impose some sort of common law tort liability. In Michigan, public officials cannot be held liable in tort, whether grounded upon negligence, gross negligence, wanton, willful and reckless conduct, or deliberate indifference, absent a duty to the plaintiff in particular, as opposed to the public at large. *Massey v. Grant*, 679 F.Supp. 711, 713–15 (W.D.Mich. 1988) (Bell, J.). Here, Karpen and Hoffecker owed no duty of due care to any of the individual plaintiffs in this lawsuit.

Count I alleges that Karpen and Hoffecker had a "duty to the public, including the plaintiffs, to enforce the securities laws, regulations and the Consent Order entered against the Diamond entities." Count I additionally alleges that Hoffecker had a duty to the plaintiffs to investigate complaints about the Diamond entities, or to forward such complaints to the MCSB. Under the controlling law, these are public, not private duties.

In *Gerneth v. City of Detroit*, 465 F.2d 784, 787 (6th Cir.1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 913, 34 L.Ed.2d 690 (1973), the Sixth Circuit, applying Michigan law under its diversity jurisdiction, refused to impose tort liability on a municipality that licensed a private security guard who shot and injured the plaintiff. Plaintiff argued that the municipality had negligently investigated the guard's background, but the court upheld the district court's ruling that the city's undertaking to license the alleged tortfeasor "did not create any obligation or duty to private persons, the violation of which would justify an action for damages for failure to perform the duty properly." 465 F.2d at 784–85. The Sixth Circuit observed that "[i]t appears to us that as a matter of public policy, absent a statement to the contrary by the legislature or the highest court of the jurisdiction involved, the imposition of liability for damages for beach of such a claimed [private] duty would be inappropriate...." *Id.* at 787.

This court reads *Gerneth* as creating a presumption, for the federal courts at least, that official duties in Michigan are public rather than private, unless the Michigan Supreme Court or the Michigan Legislature unequivocally say otherwise. In the present case, plaintiffs concede that no Michigan case addresses the issues of the public or private nature of the MCSB's and Attorney General's duties to enforce the securities laws and consent orders, or to investigate consumer complaints. Plaintiffs have therefore failed to overcome the judicial prong of *Gerneth*'s presumption that Karpen's and Hoffecker's duties were owed only to the public at large.

The court additionally notes, leaving aside the *Gerneth* presumption, that it does not appear likely the Michigan courts would recognize a private duty in the circumstances of this case. It is well settled in Michigan case law that the police officer's breach of his or her duty to preserve the peace does not create liability in favor of any particular individual, but only to the public. *Massey*, 679 F.Supp. at 713 (citing Michigan cases). Karpen's and Hoffecker's duties to supervise and regulate securities traders were analogous to those of the everyday police officer. They were, indeed, the police officers of the securities markets, charged with preserving the investing peace. *Cf.* M.C.L.A. §§ 451.806(a) (MCSB a "criminal justice agency"), 451.-809(b) (Attorney General may prosecute criminal securities violations). Judge Bell found this police analogy persuasive in granting a motion to dismiss in *Massey*. 679 F.Supp. at 713 (prison camp superintendent's public duty to maintain security analogous to police officer's public duty to preserve the peace).

Turning from the statements of the Michigan courts, it remains to examine the statements of the Michigan Legislature in this area. Plaintiffs rely solely on Michigan's Uniform Securities Act in arguing that the Legislature has imposed a private duty in their favor upon Karpen and Hoffecker. The Uniform Securities Act provides generally that the MCSB may investigate, adjudicate, remedy, and publicize statutory violations, and that it may refer

violators to the Attorney General for criminal prosecution. M.C.L.A. §§ 451.806–809.

Needless to say, the Uniform Securities Act does not authorize a tort action against either the MCSB or the Attorney General for failure to enforce its terms. In fact, the Act expressly disclaims creation of any cause of action other than those authorized against offerors or sellers of securities and bonded securities dealers. *See* M.C.L.A. § 451.810(h).

In light of these provisions, and the absence of any other statutory language arguably addressing the scope of public regulators' duties, the court under *Gerneth* cannot read the Uniform Securities Act as a clear expression of legislative purpose to impose any actionable duty upon public officials in favor of individuals in plaintiffs' position. Contrary to plaintiffs' assertion, this reading of the Uniform Securities Act does not render the statute meaningless. Rather, it gives the statute no more meaning than the Michigan Legislature intended. *Cf. Fred J. Schwaemmle Const. Co. v. Dept. of Commerce,* 420 Mich. 66, 360 N.W.2d 141, 145 (1984) (Uniform Securities Act "designed to protect *the public* from fraud and deception" in securities market) (emphasis added).

Plaintiffs finally contend that the court must find that the state defendants owed them individual tort duties because Count I alleges a "special relationship" between Karpen and Hoffecker and investors in the Diamond entities. The specific factors that supposedly made the parties' relationship special are not identified in the complaints. In their brief, however, plaintiffs argue that a special relationship arose when the state defendants took it upon themselves to actively regulate the Diamond entities through entry of the consent order. Presumably, plaintiffs mean to analogize to the line of cases imposing an individual duty of due care upon a rescuer who undertakes to save another person from some peril.

In Michigan, the recognition of a special relationship, and consequent individual tort duty, is grounded in a social policy of imposing liability upon persons in control of those deemed unable to protect themselves. *Williams v. Cunningham Drug Stores, Inc.,* 429 Mich. 495, 418 N.W.2d 381, 383 (1988). With this standard in mind, the court concludes that recognition of a special relationship under the circumstances of this case is improper for two reasons.

First, the court concludes as a matter of law that Karpen and Hoffecker cannot be said to have been in "control," in any meaningful sense, of plaintiffs or their investment decisions. Certainly, the state defendants here exercised less influence over the conduct and volition of plaintiffs than do tortfeasors in those situations where the Michigan courts have previously recognized a special relationship, such as common carrier/passenger, inkeeper/guest, employer/employee, landlord/tenant, proprietor/patron, or resident/invitee. *See, e.g., Williams,* 418 N.W.2d at 383; *Roberts v. Pinkins,* 171 Mich.App. 648, 430 N.W.2d 808, 811 (1988).

Second, and more important, even if the court is in error on the question of the state defendants' control over plaintiffs, this is not the proper forum for recognition of special relationships not firmly announced by the Michigan courts. In light of *Gerneth,* a federal district court must be especially sensitive when asked to recognize a duty exposing state officials to virtually unlimited potential tort liability, on the basis of a doctrine grounded in state social policy. The social policies of Michigan are for the courts and legislature of Michigan to decide. *See Gerneth,* 465 F.2d at 787.

In the present case, plaintiffs have not cited any Michigan case or statute that suggests the existence of a special relationship between state securities regulators and defrauded investors, and the court knows of none. Indeed, with the exception of cases involving institutionalization or state-sponsored medical treatment, the court is aware of no Michigan case holding that the state or state actors exercised sufficient control over a vulnerable plaintiff to give rise to any special relationship. In these circumstances, the court rejects plaintiffs' argument that a special relationship imposed individual duties of care in

their favor upon Karpen and Hoffecker. Count I will be dismissed for failure to state a claim.

■ Count IV alleges that the state defendants aided and abetted the Diamond entities' 10b–5 violations. As stated earlier in connection with the Jaffe defendants, in the Sixth Circuit a 10b–5 aiding and abetting claim requires allegations that 1) some other person has committed a securities law violation, 2) that the accused aider-abettor had general awareness that his role was part of an overall activity that is improper, and 3) that the accused person knowingly and substantially assisted the violation. *Moore*, 809 F.2d at 303.

The state defendants here stand on a different footing than the Jaffe defendants for purposes of the 10b–5 aiding and abetting analysis. In contrast to the allegations against the Jaffe defendants, nothing in the complaints alleges that Karpen or Hoffecker made any affirmative misrepresentations to Diamond/Obie investors or anyone else. Rather, Count IV alleges that at most the state defendants knew about the Diamond entities' fraudulent activities, but failed to investigate consumer complaints and ignored the violations.

Count IV adequately alleges securities law violations by the Diamond entities and general awareness of improper activity by Karpen and Hoffecker. Count IV thus satisfies *Moore's* first two requirements. The salient issue here is whether Count IV's allegations of nonfeasance suffice to plead knowing and substantial assistance to the Diamond fraud by the state defendants.

In *Moore,* the Sixth Circuit observed that

As to the third requirement, the analysis required by this factor must be particularly exacting in cases involving non-disclosure. *Washington County*, 676 F.2d at 226. Plaintiffs must show that the silence of the accused aider and abettor "was consciously intended to aid the securities law violation," and must prove either a culpable state of mind, or conduct from which a culpable state of mind can be inferred. *Id.*

809 F.2d at 303–04.

Applying this standard to plaintiffs' allegations here, the court concludes that Count IV satisfies *Moore's* third requirement. Reading Count IV liberally in plaintiffs' favor, as the court must for purposes of a Rule 12(b)(6) motion, the state defendants are alleged to have acted "knowingly." Federal pleading does not require the incantation of magic words. Count IV's allegations of "knowing" conduct are the substantial equivalent of *Moore's* "conscious intent." *See Black's Law Dictionary* 727–28, 784 (5th ed. 1979). Because the complaints set forth facts satisfying all the requirements of *Moore,* the state defendants' motions to dismiss Count IV will be denied.

Count X seeks to impose liability upon the state defendants for civil conspiracy, a Michigan common law tort. Conspiracy typically presupposes intentional conduct. Nevertheless, Michigan law does not clearly except intentional torts from the general rule that public officials owe their duties to the public, not to individuals. *Massey*, 679 F.Supp. at 715. Plaintiffs provide no basis for departing from the *Gerneth* presumption for purposes of their conspiracy claim. Therefore, Count X will be dismissed.

*D. Summary.*

In light of the foregoing, the court will order the following action on defendants' motions to dismiss. The Jaffe defendants' motion will be granted with respect to the complaints' Counts II, V, VI, VIII, and IX. Their motion will be denied with respect to Counts III, IV, VII, and X. The state defendants' motions will be granted with respect to Counts I, II, V, VI, and X. Their motions will be denied with respect to Count IV.

### III. Additional Matters

A status conference was held in these cases on March 17, 1989. The parties and the court agreed at the conference that case number G88–380 CA1 and case number G88–582 CA1 are identical, except they involve different plaintiffs. The parties and the court also agreed that there is no reason why identical claims against the

same defendants should proceed in two actions instead of one.

Accordingly, the court will order of its own motion under Fed.R.Civ.P. 21 that all plaintiffs from case number G88–582 CA1 be added to case number G88–380 CA1. The additional plaintiffs from case number G88–582 CA1 shall be treated the same in all respects as the original plaintiffs in case number G88–380 CA1. Specifically, the claims of the additional plaintiffs shall be deemed to relate back to the date case number G88–380 CA1 was filed. *See* 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1688 (1986 & Supp. 1988). Case number G88–582 CA1 will be dismissed.

The court and the parties additionally agreed that following elimination of the parallel case problem, plaintiffs would amend their complaint. The court will therefore order amendment of the first amended complaint in case number G88–380 CA1. The caption of the second amended complaint to be filed should alphabetically list as parties plaintiff all original plaintiffs in case G88–380 CA1, plus all plaintiffs added to case number G88–380 CA1 from case number G88–582 CA1 in accordance with the present opinion and accompanying order. Of course, each specific plaintiff's claim should be detailed in the body of the complaint. No additional plaintiffs will be allowed.

The second amended complaint should not list as a party plaintiff any person who is pursuing substantially similar claims against the same defendant in either of the cases filed by Mr. Norris: *Schriemer v. Greenburg,* case number G87–56 CA1, and *Abdorabehe v. Greenburg,* case number G88–488 CA1. The court will grant plaintiffs' counsel in the present actions sufficient time to resolve this problem with Mr. Norris. Accordingly, plaintiffs' second amended complaint in case number G88–380 CA1 will be due on or before June 12, 1989. Failure by plaintiffs' counsel and Mr. Norris to eliminate overlapping claims by their clients in the respective amended complaints to be filed in case number G88–380 CA1 and Mr. Norris' case number G87–56 CA1 will result in dismissal of those claims from either case as the court sees fit.

Following the filing of the second amended complaint in case number G88–380 CA1, and of the third amended complaint in Mr. Norris' case number G87–56 CA1, the court will schedule a joint consolidation and discovery conference in all pending A.J. Obie/Diamond Mortgage Corp. cases. Copies of this opinion and order will be forwarded to all counsel of record in the Obie/Diamond cases.

## ORDER

In accordance with the opinion filed this date,

IT IS ORDERED that the motions filed by defendants Peter Sugar, David Warner, and Jaffe, Snider, Raitt & Heuer, P.C. to dismiss Counts II, V, VI, VIII, and IX of the first amended complaint in case number G88–380 CA1, and of the amended complaint in case number G88–582 CA1, are granted, and those counts are dismissed.

IT IS FURTHER ORDERED that the motions filed by defendants Peter Sugar, David Warner, and Jaffe, Snider, Raitt & Heuer, P.C., to dismiss Counts III, IV, VII, and X of the first amended complaint in case number G88–380 CA1, and of the amended complaint in case number G88–582 CA1, are denied.

IT IS FURTHER ORDERED that the motions filed by defendants James Karpen and Frederick Hoffecker, to dismiss Counts I, II, V, VI, and X of the first amended complaint in case number G88–380 CA1, and of the amended complaint in case number G88–582 CA1, are granted, and those counts are dismissed.

IT IS FURTHER ORDERED that the motions filed by defendants James Karpen and Frederick Hoffecker, to dismiss Count IV of the first amended complaint in case number G88–380 CA1, and of the amended complaint in case number G88–582 CA1, are denied.

IT IS FURTHER ORDERED that the plaintiffs in case number G88–582 CA1 are

added to case number G88–380 CA1 on the terms described in the opinion.

IT IS FURTHER ORDERED that plaintiffs in case number G88–380 CA1 file on or before June 12, 1989 a second amended complaint conforming to the substantive rulings and procedural directions contained in the opinion.

IT IS FURTHER ORDERED that case number G88–582 CA1 is dismissed.