**GOTHAM PRINT, INC., Plaintiff,**

v.

**AMERICAN SPEEDY PRINTING CENTERS, INC., Vernon Buchanan, William McIntyre, Jr., Gerald Bergler, and Gary Shovlin, Defendants.**

No. 93–CV–70290–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 15, 1994.

Allen J. Lippitt and William D. Riley, Riley & Roumell, Detroit, MI, for plaintiff, Gotham Print, Inc.

Kiernan F. Cunningham, Strobl & Manoogian, Bloomfield Hills, MI, for defendants American Speedy, Gerald Bergler and William McIntyre, Jr.

David L. Steinberg, Hertz, Schram, Bloomfield Hills, MI, for defendant Vernon Buchanan.

*OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR DISMISSAL/SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. INTRODUCTION

This securities fraud/RICO action is presently before the Court on three separately filed Motions for Dismissal/Summary Judgment:

1. Defendant Vernon Buchanan's Motion to Dismiss;
2. Defendant William McIntyre's Motion for Summary Judgment; and
3. Defendants American Speedy Printing Centers, Inc. ("ASPCI"), Gerald Bergler and William McIntyre's Motion for Summary Judgment on Count I.

█ Plaintiff has responded in writing to each of these Motions, to which Responses, each of the moving Defendants has replied.[1]

Having reviewed and considered the parties' respective briefs and supporting documents, and having heard the oral arguments of the parties' attorneys at the hearing held on February 17, 1994, the Court is now prepared to rule on the subject motions. This Opinion and Order sets forth that ruling.

## II. FACTUAL BACKGROUND

This action arises out of transactions and events surrounding a "Master Franchise Agreement" between Plaintiff GOTHAM PRINT, INC. and Defendant AMERICAN SPEEDY PRINTING CENTERS, INC. ("ASPCI"). The individual Defendants VERNON BUCHANAN, WILLIAM McINTYRE, JR., and GERALD BERGLER are all present and/or former directors/officers of ASPCI.[2] As alleged by Plaintiff in its First and Second Amended Complaint,[3] the facts surrounding the transactions at issue are as follows.

1. Plaintiff has moved to strike one of the Reply Briefs—the reply of Defendant Vernon Buchanan to Gotham Print's response to Buchanan's motion to dismiss—on the ground that this Reply Brief was filed more than five days after Plaintiff served its response, in contravention of Eastern District Local Rule 7.1(d). However, inasmuch as this Reply was filed and served on Plaintiff five weeks before the hearing on this matter, Plaintiff has not shown, and cannot show, that it has been prejudiced by the Court's acceptance of the late brief. There being no showing of prejudice, the Court will DENY Gotham Print, Inc.'s "Motion to Strike Pleading of Defendant Vernon Buchanan".

2. Defendant Gary Shovlin was dismissed, pursuant to the stipulation of the parties, by this Court's Order of September 23, 1993.

3. On February 4, 1994, after the Court sent the parties Notices of the hearing on the instant

ASPCI was in the business of franchising printing stores throughout the United States and other countries. In 1986, pursuant to a plan to expand the growth of the company, ASPCI began contracting with third parties to act as "middlemen" or "distributors" to develop new franchises and to support existing franchises through a series of "Master Franchise Distributorships." It appears that Master Franchise Distributors were given a geographic area in which to develop new ASPCI franchises. They also directed the functions of existing franchises in the territory. In turn, the Master Franchisees were entitled to a percentage of the franchise royalties paid by the franchisees to ASPCI.

With respect to the Master Franchise Agreement at issue in this lawsuit, in June of 1990, Thomas Tybinka, the president of Gotham Print, Inc., and another Gotham-affiliated individual, Tony Romano, met with Defendant Vernon Buchanan, the chairman of the board of directors and CEO of ASPCI, in ASPCI's offices in Bloomfield Hills, Michigan, to discuss the prospects of purchasing an ASPCI Master Franchise Distributorship in the New York City region. These discussions continued in July 1990.

According to Plaintiff's First Amended Complaint, a principal point of negotiation regarding Gotham Print's purchase of a Master Franchise Distributorship was the particular geographic region to be covered. Gotham wanted the territory to include all New York City zip codes, plus a part of New Jersey and two counties in Connecticut. Gotham was to have the exclusive right to control ASPCI franchise development in the geographical area. Gotham also was promised a working capital loan from ASPCI in the amount of $150,000.

On July 12, 1990, Defendants Buchanan, Bergler and Shovlin again met with Messrs. Tybinka and Romano. A proposed Master Franchise Agreement, which called for Gotham's payment of $1,800,000 to ASPCI, was presented to Tybinka and Romano to review. This draft Agreement provided for Gotham's exclusive rights to the New Jersey and Connecticut areas, as well as all New York City zip codes. Tybinka and Romano were also promised, both orally and in writing, the $150,000 working capital loan they wanted. More details were worked on at a meeting held on August 23, 1990.[4]

The parties met again a few days later to sign the final Master Franchise Agreement. However, the promised Connecticut territory was not included in the Agreement, nor was the promise of $150,000 working capital loan. The Defendants represented that amendments would be made to the Agreement. Mr. Tybinka executed the Agreement on behalf of Gotham. However, as a result of the omissions of the Connecticut territory and working capital loan provisions, only half of the required $250,000 down payment was given by Gotham; the balance of the downpayment was being withheld until such time as Connecticut was added and the working capital loan was arranged. As for the remaining $1,550,000 of the $1,800,000 purchase price, this amount was covered by two promissory notes for $775,000 each executed by Mr. Tybinka.

During the first two weeks of September 1990, Mr. Buchanan and Mr. Tybinka were in frequent contact regarding the Master Franchise Agreement. On September 21, Tybinka and Buchanan met again. At this meeting, Buchanan provided Tybinka with a letter promising to resolve all outstanding issues. Based on the representations in this letter, Tybinka paid in the $125,000 balance due on the down payment.

However, despite frequent meetings over the next three months, nothing was resolved.

On February 12, 1991, Tybinka met with Buchanan and with newly-appointed ASPCI

dispositive motions and less than 2 weeks before the noticed hearing date, Plaintiff filed a Motion for Leave to File a Second Amended Complaint. Although significantly untimely, since no new causes of action are alleged, the Court will GRANT Plaintiff's motion and will accept for filing the proposed Second Amended Complaint attached to Plaintiff's February 4, 1993 Motion as Exhibit A and will treat Defendants' motions

to dismiss/for summary judgment as addressing allegations in both the First and Second Amended Complaint.

4. By this time, Messrs. Romano and Tybinka agreed that Romano would no longer have an interest in the Distributorship and he was out of the picture as of August 23, 1990.

President William McIntyre. At this meeting, Tybinka was informed that nothing could be done about adding Connecticut because that territory was already given to another Master Franchise Distributor. Tybinka offered to trade the two Connecticut counties Gotham was promised in exchange for all of New Jersey. Buchanan agreed and directed McIntyre to arrange for this compromise.

McIntyre and Buchanan also advised Tybinka at this meeting that they could not provide the promised $150,000 loan. Tybinka told them that he would arrange for his own loan if ASPCI would provide a guarantee of it. Buchanan and McIntyre agreed.

Despite meetings and discussions over the ensuing months, nothing was resolved. Finally, in late January 1992, McIntyre set up a meeting for early February 1992, with the assurance that he had resolved all of the issues and that Tybinka would leave the meeting satisfied. Before this meeting took place, however, ASPCI filed for bankruptcy protection, and Gotham was left with no direct remedies against ASPCI, other than filing a claim as an unsecured creditor.

### III. *PLAINTIFF'S CLAIMS IN THIS LAWSUIT*

Plaintiff claims that during the pre-contract negotiations pertaining to the Master Franchise Agreement, Defendants made false representations on past successes of other then-existing Master Franchise Distributorships and provided Plaintiff with false and misleading financial projections for a New York City Distributorship. Gotham further contends that from the very beginning of the negotiations, Defendant Buchanan knew that the Connecticut area and two zip code areas of New York City, which Gotham desired and which was promised to Gotham in the proposed Master Franchise Agreement, were already under contract to other Master Franchise Distributorships, but Buchanan failed to reveal this information to

Gotham's representatives. Gotham also contends that the Defendants fraudulently misrepresented the financial strength of ASPCI and failed to reveal to Plaintiff that ASPCI was considering filing for bankruptcy at the time of the negotiations and also failed to reveal that ASPCI was being sued by several other Master Franchise Distributors.

Based upon the above allegations of fraud, Gotham has filed a four-count Amended Complaint alleging two federal claims: securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 of the General Rules and Regulations under the Securities Exchange Act of 1934 (Count I) and violation of Section 1962(a) and (c) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") (Count II). Plaintiff also has alleged two state common law fraud claims: conspiracy to commit fraudulent misrepresentation (Count III) and fraudulent misrepresentation (Count IV).

Defendant ASPCI has filed a counterclaim/third-party claim against Plaintiff Gotham Print, Inc. and its president Thomas Tybinka based upon nonpayment of two promissory notes dated August 25, 1990, each in the face amount of $775,000.

### IV. *DEFENDANTS' SUMMARY JUDGMENT ARGUMENTS*

Defendants seek dismissal of Plaintiff's Complaint on several grounds. First, with respect to Plaintiff's claims of securities fraud, Defendants argue that the Master Franchise Agreement at issue in this case is not a "security", as that term is defined in the statute or as the term has come to be defined by case law, and therefore, Plaintiff's Count I claims fail as a matter of law.[5]

With respect to Count II (violation of RICO), Defendants argue that Plaintiff has failed to establish any legally cognizable "predicate act". In Plaintiff's Complaint, the alleged RICO predicate acts are securities

---

**5.** As an alternative basis for dismissal of Count I, Defendants argue that Plaintiff's securities fraud claims should be dismissed for failure to allege plead with particularity. Relying on Fed.R.Civ. Pro. 9 and case law construing and applying that rule, Defendants argue that Plaintiff only pleads very general allegations against a group of De-

fendants and has repeatedly failed to state with particularity its allegations of fraud in terms of time, place and content, and has failed to identify the particular Defendant or Defendants allegedly responsible for each fraudulent representation or omission.

fraud, mail fraud and wire fraud. Defendant's securities fraud arguments are discussed above. With respect to the allegations of mail and wire fraud, Defendants argue that Plaintiff has failed to allege such claims with the requisite degree of specificity required by Fed.R.Civ.Pro. 9(b).

Defendants further argue that Plaintiff has failed to establish a RICO "pattern" of racketeering activity, pursuant to the requirements regarding that element set forth by the Supreme Court in *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). Defendants also argue that Plaintiff cannot show the existence of any "enterprise" which exists independently of the named Defendants.

Defendant McIntyre also seeks dismissal of Plaintiff's Complaint on the ground that Plaintiff cannot establish that Defendant McIntyre had any personal involvement with the events involved in the negotiation/inception of the Master Franchise Agreement; he became President of ASPCI five months after Gotham and ASPCI entered into the Master Franchise Agreement, and his involvement consisted only of attempting to resolve the dispute between the parties. In short, McIntyre contends that none of the allegations of fraud in Plaintiff's Complaint pertain to any actions taken by him.

With respect to Plaintiff's state common law fraud claims (Counts III and IV), Defendants argue for the Court's dismissal of these state law claims by application of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), for lack of federal court jurisdiction.

The Court will address each of these arguments seriatim.

## V. *DISCUSSION*

Although some of the Defendants have captioned their motions as "Motions to Dismiss" pursuant to Fed.R.Civ.Pro. 12(b)(6), they have presented to the Court materials outside the formal pleadings in this matter. The Court has accepted and considered these additional materials and, therefore, in accordance with Rule 12(b), this Court will treat Defendants' Motions as motions for summary judgment in accordance with Fed.R.Civ.Pro. 56.

## A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[6] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

★ Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

★ The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This

---

6. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

★ The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

★ The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

★ The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will decide Defendants' Motions by application of the foregoing standards.

## B. *PLAINTIFF HAS FAILED TO STATE A CLAIM OF SECURITIES FRAUD*

Plaintiff claims violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.

■ The elements necessary to state a claim of securities fraud under Section 10(b)/Rule 10b–5 claim are: 1) use of jurisdictional means 2) to implement a deceptive or manipulative practice (with scienter) 3) in connection with 4) the purchase or sale 5) *of a security* 6) causing 7) damages. *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1026 (6th Cir.1979) (emphasis added).

Section 78c(a)(10) of the 1934 Act defines a "security" as follows:

The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* voting-trust certificate, certificate of deposit, for a security or in general, any instrument commonly known as a "security"....

15 U.S.C. § 78c(a)(10) (emphasis added).

Neither the 1934 Act nor the Securities Act of 1933, 15 U.S.C. § 77 *et seq.,* provides a definition of "investment contract". However, the Supreme Court has filled in this gap in the statutes.

■ In *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Court held that whether an "investment contract" interest exists required a demonstration that the business venture called for (1) an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others. 328 U.S. at 300–01, 66 S.Ct. at 1104. The "profits coming *solely* from the efforts of others" element has been slightly modified in the ensuing years since *Howey.* In *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir. 1973), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the Ninth Circuit replaced the "*solely* from the efforts of others" portion of the *Howey* test with one requiring a showing that:

the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

474 F.2d at 483 (emphasis added).

Following the *Glenn Turner* decision, the Supreme Court restated its *Howey* investment contract definition in *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) as follows:

The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

421 U.S. at 843, 95 S.Ct. at 2056.

With respect to the *Glenn Turner* modification of the *Howey* test, the *United Housing* Court noted that, although the Ninth

Circuit had held that the word "solely" should not be read as a strict limitation on the definition of an investment contract, that issue was not before the Court in *United Housing,* and, therefore, the Court was "express[ing] no view as to the holding of *[Glenn Turner]*." 421 U.S. at 852, n. 16, 95 S.Ct. at 2060, n. 16.

■ The Sixth Circuit has not adopted the *Glenn Turner* test in the context of franchise-type arrangements. Although the court noted *Glenn Turner*'s modification of the *Howey* rule in *Nash & Associates, Inc. v. Lum's of Ohio, Inc.,* 484 F.2d 392 (6th Cir. 1973), the court nonetheless adhered to the *Howey* formulation of the requisite elements of an investment contract in the context of a restaurant franchise arrangement, and found that franchise agreements were *not* investment contracts within the meaning of the securities laws. The *Nash* court explained the basis of its decision:

> In the traditional franchise arrangement, the franchisee manages the local business and it therefore cannot be said that his return comes solely from the efforts of others.

484 F.2d at 395.[7]

By application of the principles extracted from the foregoing decisions, courts have virtually unanimously concluded that franchise and distributorship arrangements are not "investment contracts", and, hence, not securities within the meaning of the federal securities laws. *See e.g., Nash & Associates, Inc. v. Lum's of Ohio, Inc., supra,* (restaurant franchise not a security); *Lino v. City Investing Co.,* 487 F.2d 689 (3rd Cir.1973); *Bitter v. Hoby's International, Inc.,* 498 F.2d 183 (9th Cir.1974) (restaurant franchise not a security); *Crowley v. Montgomery Ward & Co.,* 570 F.2d 877 (10th Cir.1978) (catalog sales franchise not a security); *Villeneuve v. Advanced Business Concepts Corp.,* 730 F.2d 1403 (11th Cir.1984) (en banc) (distributorship for sale of self-watering planters not a

security); *Meyer v. Dans Un Jardin, S.A.,* 816 F.2d 533 (10th Cir.1987) (retail beauty products boutique franchise not a security).

In all of these franchise/distributorship cases, the courts found that in such business arrangements, the managerial efforts are those of the franchisee, not solely, primarily or in any large part the efforts of "others".

Plaintiff does not dispute this result in a "traditional" franchise arrangement. However, Gotham contends that the Master Franchise Agreement at issue in this case is different from a "traditional" franchise in that as the "Master Franchisee", its profits *did* derive from the efforts of others—the franchisees of the Speedy Printing businesses developed, or to be developed, in Gotham's territory. An analysis of Gotham's Master Franchise Agreement, however, demonstrates that, contrary to Plaintiff's assertions, from the inception of the Agreement, Gotham as Master Franchisee was intended as much more than a mere "passive" investor.

The Master Franchise Agreement contemplates that profits, if any, will be derived, if not primarily, then at least in large part, from the managerial/entrepreneurial efforts of Gotham. While Plaintiff correctly asserts that the work of franchisees will contribute to Gotham's profits, it overlooks the important first step to Gotham's earning a share of the money generated by the franchisees— i.e., that it is *Gotham's* entrepreneurial efforts in recruiting Speedy Printing franchisees in the territory that enables Gotham to have any claim to its percentage of franchisee monies. In other words, without Gotham recruiting franchisees, Gotham would have no right to profits, whatsoever.

Further, as provided in the Agreement, Gotham was to itself operate 10 franchises in the territory. As expressly provided in the Master Franchise Agreement [para. 1], Got-

**7.** While Plaintiff is correct in asserting that the Sixth Circuit "concur[red] with and adopt[ed] the analysis in *S.E.C. v. Glenn W. Turner Enterprises, Inc.*" in *Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985), Plaintiff neglects to point out that *Davis* did not involve a franchise or master franchise/distributorship arrangement. Rather that case dealt with the securities issue in the context of a "pyramid" scheme. The court held that Avco was liable to some of the investors *"on the basis of its manager's efforts to promote DTBG [Dare To Be Great, the pyramid plan at issue] adventures."* 739 F.2d at 1063.

ham's and ASPCI's rights and obligations with respect to these 10 franchises were to be governed by ASPCI's standard (traditional) Franchise and License Agreements, and thus, clearly within the scope of the law developed for "traditional" franchises.

With respect to Gotham's development of new franchises in the territory, the Agreement sets forth particular managerial duties which Gotham, as Master Franchisee was obligated to perform:

[Gotham] shall act as an independent contractor in promoting the sale of American Speedy Printing Center franchises within the Territory and within the guidelines established by [ASPCI]. They shall include, but not be limited to *conducting seminars and business information meetings, personal visits, telephone contacts and written correspondence to all prospects. [Gotham] shall, in acting as an independent contractors,* promote the sale of ASPC franchises in the Territory during the term of this Agreement, *be responsible for sales commissions and other costs associated with such sales, whether such sales are by [Gotham] or, if by [ASPCI], upon [Gotham]'s prior approval.*

[Master Franchise Agreement, para. 5]

The Agreement further required Gotham to undertake the following activities in its territory:

1. Procure and obtain prospective franchisees, submit franchisee profiles, credit reports, financial statements and tax returns of prospective franchisees;

2. Assist the prospective franchisee in selecting a site location;

3. Negotiate franchise agreements with prospective franchisees;

4. Promote the sale of Speedy Printing franchises in the territory;

5. Assist franchisees in the territory in the recruitment of personnel;

6. Assist Speedy Printing in enforcing all terms of Franchise and License Agreements;

7. Pay for all travel, meals and lodging of Speedy Printing personnel who assist Gotham in the Territory;

8. Assume all direct and indirect costs and expenses associated with Gotham's performance of Speedy's obligations under franchise agreements. These obligations include, but are not limited to:
—franchise site selection,
—inspection and set up of equipment for franchises,
—arrange for shipment and payment of initial supplies to franchisees,
—pay for the franchise owner's travel and lodging expenses for training at ASPCI's national training center,
—pay for franchise owner's on-site training,
—provide continued consulting services to franchisees,
—provide accounting services for franchisee payments,

9. Hire executive, marketing and support personnel.

10. Provide advertising assistance, including assuming 70% of financial responsibility for advertising costs, in the territory.

■ Where, as here, a franchisee/plaintiff retains duties with respect to hiring and firing of personnel, maintenance of good customer relations, and day-to-day business promotion and salesmanship, even though the franchisor retains certain rights, such as the right to specify the decor of the store, operating hours, store location, quality of merchandise and physical arrangement of equipment within the store, no "investment contract" exists. *See e.g., Plum Tree, Inc. v. Seligson,* 383 F.Supp. 307 (E.D.Pa.1974); *Meyer v. Dans Un Jardin, S.A., supra,* 816 F.2d at 535–536.

For all of the foregoing reasons, the Court finds that the Master Franchise/Distributorship relationship between Gotham and ASPCI was not an investment in a venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. The Master Franchise Agreement clearly contemplated Gotham's substantial *active* participation. Therefore, no "security" within the meaning of the federal securities laws exists and, accordingly, Plaintiff's Count I must be dismissed.

## C. PLAINTIFF HAS FAILED TO ESTABLISH A LEGALLY COGNIZABLE CLAIM FOR DAMAGES UNDER RICO

Plaintiff alleges that Defendants violated RICO Section 901(a), 18 U.S.C. § 1962. This section of the statute provides, in pertinent part:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use, invest, directly or indirectly, any part of such income, or the proceeds of such income in acquisition of any interest in or the establishment of, any enterprise, which is engaged in, or the activities of which affect, interstate or foreign commerce. . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activity of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section.

Plaintiff alleges that Defendants have violated subsections (a) and (c) of Section 1962.

RICO prohibited "racketeering activities" are defined in 18 U.S.C. § 1961:

As used in this chapter—

(1) "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18 United States Code: Section 201 (relating to bribery [of public officers and witnesses] ), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), section 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to interference of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States.

As the foregoing makes clear, unless the "activities" of the Defendants complained of by Plaintiff in this case fall within the limited list of "racketeering activities" set forth in 18 U.S.C. § 1961(1), they cannot be used as "predicate acts" for purposes of establishing a legally cognizable RICO violation.

1. *Since There Is No Legal Merit To Plaintiff's Securities Fraud Claim, Gotham's RICO Allegations Predicated Upon Such Fraud Must Fail, As Well.*

Plaintiff alleges as RICO "predicate acts", violation of the federal securities laws, mail fraud and wire fraud.

■ As an initial matter, to the extent that Plaintiff's RICO claim is predicated upon a claim of violation of the federal securities laws, because the Court has already determined that Plaintiff has failed to establish a violation of the securities laws, Gotham's allegations of securities law violations as the RICO predicate acts must be dismissed as well. *Berent v. Kemper Corp.*, 780 F.Supp. 431, 445 (E.D.Mich.1991), *aff'd*, 973 F.2d 1291, 1292 (6th Cir.1992). *See also, Cahill v. Arthur Andersen & Co.*, 659 F.Supp. 1115, 1125–1126 (S.D.N.Y.1986), *aff'd*, 822 F.2d 14 (2d Cir.1987) ("Because plaintiff's first cause of action fails to state a claim for relief for securities fraud, the plaintiff cannot rely on this claim to establish the predicate acts necessary to sustain his third cause of action under RICO."); *Dumbarton Condominium Association v. 3120 R Street Associates Limited Partnership*, 657 F.Supp. 226, 232 (D.D.C.1987) (where the court held that because the contracts entered into between the parties were not "investment contracts" subject to the securities laws, plaintiff failed to demonstrate that defendants' activities constituted a securities fraud predicate act under RICO).

Since this Court has determined in Section B, *supra*, that the Master Franchise Agreement at issue was not an "investment contract" within the meaning of the federal securities laws, the allegations in Count II that Defendants have violated those laws are insufficient to satisfy the predicate act requirement of RICO.

Therefore, the Court must determine whether Plaintiff has demonstrated legally cognizable predicate acts of mail and/or wire fraud.

2. *Plaintiff Has Failed to Adequately Allege the Commission of Predicate Acts of Mail or Wire Fraud Under Section 1962(c)*

■ Paragraph 67 of Plaintiff's First Amended Complaint [Paragraph 72 of the Second Amended Complaint] contains Gotham's allegations of mail and wire fraud. Plaintiff alleges in that paragraph:

> Pursuant to and for the purpose of executing their scheme and artifice and with specific intent to defraud Gotham and obtain money by means of false and fraudulent pretenses and representations, *Defendants on numerous occasions placed in post offices or authorized depositions for mail, matter to be sent or delivered by the postal service, in violation of 18 U.S.C. § 1341 (mail fraud) and transmitted or caused to be transmitted by wire in interstate commerce writings, signs, signal or sounds, for the purpose of executing such scheme or artifice, in violation of 18 U.S.C. § 1343 (wire fraud).* Each instance of mail or wire fraud constituted racketeering activity as defined in 18 U.S.C. § 1961(1).

As this Court explained in *Berent v. Kemper Corp., supra*, "use of the mails or wires is not, in and of itself, a crime without any underlying illegal activity or fraud."

Both the mail fraud and the wire fraud statutes, 18 U.S.C. §§ 1341, 1343, make it a crime to use the mails or wires for purposes of executing any "scheme or artifice to defraud". The mail fraud and wire fraud statutes are included in RICO's definitions of "racketeering activity." 18 U.S.C. § 1961(1)(B). Thus, for Plaintiffs' Count II for a RICO wire/mail fraud violation to survive Defendants' Motions to Dismiss/for Summary Judgment, Plaintiff's Second Amended Complaint must sufficiently have pled its allegations of fraud.

Courts have repeatedly held in RICO cases alleging mail fraud and wire fraud as the "predicate acts", the underlying fraudulent activities must be pled with particularity. *See, e.g., Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666, 673 (3rd Cir.1988); *Van Dorn Co. v. Howington*, 623 F.Supp. 1548 (N.D.Ohio 1985); *NL Industries, Inc. v.*

*Gulf & Western Industries, Inc.*, 650 F.Supp. 1115, 1126 (D.Kan.1986). Courts have, accordingly, routinely dismissed RICO actions where the plaintiffs, after having been given an opportunity to correct defective complaints, still failed to assert factual allegations stating with particularity the time, place, subject matter and the precise individuals who, through use of the mails or telephone, made the purportedly fraudulent statements.

For example, *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir.1984), the Sixth Circuit affirmed the district court's dismissal of the plaintiff's RICO claims because they failed to allege the time, place, and contents of the specific misrepresentations upon which he relied. In *Saporito, supra,* the Third Circuit affirmed the dismissal of a RICO complaint in which the plaintiffs failed to plead with specificity the particular persons who made the fraudulent statements upon which the plaintiffs based their action. In *Bhatla v. Resort Development Corp.*, 720 F.Supp. 501 (W.D.Pa.1989), after the plaintiffs had twice been granted leave to amend their complaint, they still failed to allege with specificity who made the representations upon which their RICO claims. The court, therefore, dismissed those claims.

Courts have been particularly sensitive to Fed.R.Civ.Pro. 9(b)'s pleading requirements in RICO cases in which the "predicate acts" are mail fraud and wire fraud, and have further required specific allegations as to *which* defendant caused *what* to be mailed (or made which telephone calls), and *when* and *how* each mailing (or telephone call) furthered the fraudulent scheme. *See, Berent v. Kemper Corp., supra; Bennett v. Berg,* 685 F.2d 1053 (8th Cir.1982), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Barker v. Underwriters at Lloyd's, London,* 564 F.Supp. 352, 356 (E.D.Mich. 1983). *See also, Otto v. Variable Annuity Life Ins. Co.,* 611 F.Supp. 83 (N.D.Ill.1985), *aff'd in part, rev'd in part,* 814 F.2d 1127 (7th Cir.1986), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988), in which the district court found that the plaintiff failed to plead each defendant's involvement in the alleged fraud as required by Rule 9(b) and, therefore, dismissed the plaintiff's RICO Section 1962(c) count.

The allegations of Plaintiff's Second Amended Complaint have not cured the deficiencies in the First Amended Complaint upon which Defendants' Motions to Dismiss/for Summary Judgment were grounded. The Second Amended Complaint, like Plaintiff's First Complaint, fails to specifically assert which Defendant made which misrepresentations or when. While Plaintiff has enumerated some of the particular alleged representations upon which it relies, Plaintiffs have failed to set out which Defendant mailed which written item or made which telephone call, nor have they given any dates of such mailings or telephone calls. Indeed, the specific allegations upon which Plaintiff purports to base his wire fraud and mail fraud claims involve allegations of fraud *in face to face* meetings, not in telephone conversations or letters or documents received in the mail.

For all of these reasons, the Court finds that Plaintiff's conclusory allegations of mail fraud and wire fraud in Gotham's Second Amended Complaint fail to satisfy the requirements of Fed.R.Civ.Pro. 9(b) and Fed. R.Civ.Pro. 56. Having made this determination, the Court finds Plaintiff has failed to establish any predicate act upon which to base its RICO claim.

### 3. *Plaintiff Has Failed to Satisfy the RICO "Pattern" Requirement*

Even if the Court were to find that Plaintiff had sufficiently alleged RICO predicate acts of mail fraud or wire fraud, the Court would nonetheless find Plaintiff's RICO claims to be legally deficient because Plaintiff has not satisfied the "pattern" requirement articulated in the Supreme Court's decision in *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

In *Northwestern Bell,* the Court attempted to settle the split in the lower courts over the definition of "pattern" under RICO. The Court held "a pattern of racketeering activity" has two elements: relatedness and continuity. The Court determined that RICO's legislative history, "reveals Congress' intent

that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." 492 U.S. at 239, 109 S.Ct. at 2900. Thus, the Court held that the "relatedness" of predicate acts alone is not enough to satisfy Section 1962's pattern element.

> To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continued* racketeering activity.

*Id.* at 239–40, 109 S.Ct. at 2901.

The Court elaborated on the "continuity" aspect of the test:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept— and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a *series* of related predicates *extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. Congress was concerned with long-term criminal conduct.* Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.
>
> Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case. Without making any claim to cover the field of possibilities—preferring to deal with this issue in the context of concrete factual situations presented for decision— we offer some examples of how this element might be satisfied. A RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit. Suppose a hoodlum were to sell "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. Such associations include, but extend well beyond those traditionally grouped under the phrase "organized crime". The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

492 U.S. at 241–43, 109 S.Ct. at 2902 (citations and footnote omitted and some emphasis added).

Guided by the foregoing, courts since *Northwestern Bell* have found the RICO "pattern" requirement to be lacking in cases, such as the instant case, where the RICO violations alleged were based upon only a few, relatively isolated, related predicate racketeering activities which occurred over a "closed period" in the past, with no threat of repetition of the activities in the future.

For example, in *Disandro–Smith & Associates v. Edron Copier Service,* 722 F.Supp. 912 (D.R.I.1989), the plaintiff based its RICO claim upon three alleged predicate "racketeering acts" which occurred between July 1, 1986 and June 22, 1988—a period of 2 years.

The Court found that these acts "d[id] not amount to the 'long-term criminal conduct' that civil RICO is intended to redress, and therefore granted the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's RICO claim." *Id.* at 916.

Similarly, in *Fry v. General Motors Corp.,* 728 F.Supp. 455 (E.D.Mich.1989), Judge Duggan granted the defendant's Rule 12(b)(6) motion to dismiss the plaintiff's RICO action, because he determined that a series of repeated acts of alleged bribery which "began in December 1985 and climaxed in August 1986" did not satisfy the RICO continuity requirement because the acts constituted "only short-term conduct" and there was nothing in Plaintiff's Complaint "evidencing a threat of future criminality." *Id.* at 458.

In finding that the alleged "short-term conduct" was close-ended and did not entail any threat of future criminality, Judge Duggan applied the test formulated by Judge Zatkoff in *Rochester Midland Corp. v. Mesko,* 696 F.Supp. 262, 266 (E.D.Mich.1988). In that case, the court stated:

> To determine whether the conduct presents a continued threat, a reviewing court should consider whether the activity has a defined finite purpose. If the illegal scheme is well defined and is short in duration and the racketeering activity is likely to cease once the Defendants' scheme has run its course, there is little or no threat of continuity. By contrast, if the illegal scheme lacks definition, or the scheme is likely to endure for an extended period of time, or if upon accomplishment of its objective, the racketeering activity is likely to continue, then there is a continuing threat of racketeering activity of the type that RICO is designed to deter.

*Id.* at 266–267.

By application of the *Rochester Midland* test, Judge Duggan found that because the racketeering activities alleged in *Fry* had concluded when the defendant who was allegedly involved in the predicate bribery activities revoked the licenses of 13 transmission shops, "the alleged racketeering activity [had] run its course." 728 F.Supp. at 458–459.

The Court finds that facts of this case are analogous to those in *Fry* and *Disandro–Smith.* Here, we are dealing with isolated acts of alleged wire/mail fraud which occurred, at the longest, over an 18–month period, even a shorter period than in the case of *Disandro–Smith* (2 years). And, as was the case in both *Disandro–Smith* and *Fry,* in this case, the acts complained of had "run their course"; they ended with Defendants' purported failure to cure the breach of the Master Franchise Agreement in January of 1992, before ASPCI filed for bankruptcy protection. There is simply no allegation in Plaintiff's Second Amended Complaint that Defendants' predicate act conduct will in any way project out into the future.

Thus, the key element in the "continuity" test is the element of *repetition of the past racketeering acts* in the future is clearly not present here. When the Supreme Court spoke of the threat of repetition, it was referring to the threat of repeated *victimization* (as in the Court's example of the neighborhood "insurance" salesman), not merely the retention of the ill-gotten fruits of previous crimes. This element is simply not met in this case.

4. *Plaintiff Has Failed To Establish The Requisite Separate and Distinct "Investment Injury" to State a Legally Congizable RICO Claim Under Section 1962(a).*

While the above discussion applies to both Plaintiff's claim under Section 1962(c) and 1962(a), Plaintiff's claim under Section 1962(a) merits some additional discussion.

Section 1962(a) proscribes "the use or investment" of any income derived from a pattern of racketeering activity "in the establishment or operation of, any enterprise" engaged in or affecting interstate commerce. 18 U.S.C. § 1962(a).

■ The gravamen of a Section 1962(a) claim is an injury *directly* related to the investment or use of tainted money in the enterprise; Section 1962(a) is *not* applicable to injury from the racketeering activity itself. *Berent v. Kemper Corp., supra,* 780 F.Supp. at 446–447; *Rose v. Bartle,* 871 F.2d 331, 356

(3rd Cir.1989); *Omega Construction Co. v. Altman,* 667 F.Supp. 453, 465 (W.D.Mich. 1987). Thus, in order to state a viable Section 1962(a) claim, Plaintiff must allege a separate and traceable injury "stemming directly from the defendants' alleged use or investment of their illegally obtained income in the [RICO] enterprise." *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 494 (6th Cir.1990). *See also, NL Industries, Inc. v. Gulf & Western Industries, Inc., supra* 650 F.Supp. at 1128 ("[T]he plaintiff must be able to show, under [1962](a), not only that the defendant invested illegally obtained proceeds in the enterprise, but that *this investment* caused the plaintiff's harm." [Emphasis added.]) Plaintiffs' First Amended Complaint still fails to allege such an injury.

In the Second Amended Complaint, Plaintiff only claims that Defendants Buchanan, Bergler and McIntyre

> each received personal income derived from a pattern of racketeering activity and used a part or all of such income, in the acquisition of an interest in or the establishment or operation of the enterprise, in violation of 18 U.S.C. S 1962(a).

[Second Amended Complaint, para. 77.]

Plaintiff, however, has failed to allege how it was injured "*directly* from the defendants' alleged use or investment of their illegally obtained income." *Craighead, supra,* 899 F.2d at 494. The real source of Plaintiffs' purported injury is that Defendants supposedly made certain misrepresentations and failed to disclose certain facts—*not* that they were injured by Defendants investment of money generated by those actions in the operation of ASPCI, the alleged RICO enterprise.

In *Bhatla v. Resort Development Corp., supra,* the plaintiffs similarly claimed that they received an investment injury because the defendants made some misrepresentations when they sold plaintiffs some condominiums and then invested the proceeds from the sales. The court dismissed their RICO claim, explaining,

> [T]he conduct constituting a violation under § 1962(a) is not the mere receipt of money derived from a pattern of racke-

teering activity. Nor can a violation be premised on the investment in an enterprise affecting interstate commerce. Rather, the essence of the violation of § 1962(a) is the use or investment of the tainted money in an enterprise. Therefore, to have standing to assert a RICO claim under § 1962(a) an injury to one's business or property must occur *because of the investment* of tainted money in an enterprise affecting commerce, the essence of the violation.

> In the instant case, plaintiffs' pleading of an injury by the investment has been simply in conclusory fashion. Plaintiffs have not shown, however, an injury because of the investment of tainted money in an enterprise affecting commerce. Whether the defendants did or did not invest the proceeds from the sale of the condominiums is not causally related to the plaintiffs' alleged injury. That is, the fact that the condominiums were not what they were represented to plaintiffs when they purchased their units is not causally related to the investment of the proceeds. For this reason, plaintiffs lack standing to assert a RICO claim based on § 1962(a) against the U.S. Capital defendants.

720 F.Supp. at 508.

The same is true in this case—the injury alleged by Plaintiff is from the claimed racketeering activity, not "from the actual use or investment of racketeering income funds." [5/7/90 Opinion, p. 9.] *See also, NL Industries, supra* ("If plaintiff suffered any RICO injury (which it did not), it was the result of the defendants conducting an enterprise through a pattern of racketeering activity—a violation of § 1962(c)." 650 F.Supp. at 1150.)

For all of the foregoing reasons, all of the federal claims in Plaintiff's Second Amended Complaint (Counts I and II) will be dismissed with prejudice, and Plaintiffs' pendent state law fraud claims (Counts III and IV) will be dismissed pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### ORDER

For the reasons stated above in this Opinion, and the Court being otherwise fully advised in the premises,

IT IS HEREBY ORDERED that the Defendants' three separately-filed Motions to Dismiss/for Summary Judgment be, and hereby are, GRANTED. Accordingly,

IT IS FURTHER ORDERED that Counts I and II of Plaintiff's Second Amended Complaint are hereby DISMISSED WITH PREJUDICE. Counts III and IV of Plaintiff's Second Amended Complaint and Defendant ASPCI's Counterclaim are hereby dismissed pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).